[No. A062655. First Dist., Div. Five. Dec. 20, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY WILLIAMS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976(b) and 976.1 of the California Rules of Court, this opinion is certified for publication with the exception of parts II through VIII.

COUNSEL

John Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HANING, J.—Gregory Williams appeals his conviction by jury verdict of first degree murder with special circumstances of robbery (Pen. Code,

§§ 187, 190.2, subd. (a)(17)(i))[1] and sale of cocaine base. (Health & Saf. Code, § 11352.) Appellant asserts instructional and sentencing error, and the erroneous denial of a new trial on the basis of newly discovered evidence.

## FACTS

The body of the victim, Dana Lee Morris, was discovered at the rear of an apartment building at 3837 Martin Luther King Way on the afternoon of September 24. Death was caused by multiple blows to the head. Investigators recovered a rock from under the victim's head and a blood-covered metal pipe lying a few feet from the body.

Shanti Manuel and Felicia Humphrey, appellant's girlfriend, went to the 3837 Martin Luther King Way apartment building in the early morning hours of September 24 to meet appellant and Ronald Talford. Humphrey saw the victim drive to the building in a gray car in which appellant was a passenger. The victim had been seen the night before carrying a large quantity of cash. Humphrey was standing with appellant next door to the building when Dalton Sykes approached them and said, "He's got some money. The [W]hite man's got some money. Let's rob him." Sykes asked the victim for "the" money and went through his pockets and wallet, which were empty. The victim gave Sykes some money he found on the passenger side of the car, whereupon Sykes departed in a passing car. Appellant was sitting on the victim's car when Sykes left. Talford told the victim to remove the car's speakers and radio. The victim stood next to the driver's door while Talford removed them and took them into the building.

When appellant asked the victim for documentation of his address, the victim took his car registration from his wallet, gave it to appellant and asked if he could leave. Appellant said he could not leave because he had seen appellant's face. He told the victim to "stay there" while he went to get Talford, who had gone into the building. He told Felicia Humphrey to join Shanti Manuel inside the building shutting its door and security gate behind them. After several minutes Humphrey looked outside and saw Talford coming from the side of the building toward the security gate. She did not see appellant or the victim. Appellant appeared a few minutes later. He was angry and said, "You all think I'm a joke. I ain't no joke."

Appellant and Talford then departed for several minutes. When they returned Talford vomited in the building hallway and asked appellant, "Why did you do that?"

Thereafter appellant, Talford and the two women went to Humphrey's house, where appellant told Humphrey he killed the victim because he "had

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

a lot of anger because he was locked up for four years," and that his anger came out when the victim was in the wrong place at the wrong time. He told her he hit the victim with a rock and a pole and described the resulting appearance of the victim. He told her he had taken Talford to the rear of 3837 Martin Luther King Way to see the victim's body.

Following his arrest appellant admitted killing the victim and described for the police how he committed the act with a metal pipe and a rock. He said he intended only to hit the victim hard enough so he would not remember what appellant looked like and would wonder where he was when he awoke. He denied any involvement with a robbery but admitted searching the victim's car for money.

### Defense

Appellant testified that he had been drinking steadily from 3 p.m., September 23 until 2:15 a.m., September 24 and also smoked marijuana during that period. Appellant's expert witness, psychiatrist Fred Rosenthal, was of the opinion that appellant was intoxicated the night of the killing, given the quantity of alcohol he said he consumed. He said that a person who consumed such an amount would act rashly, impulsively, and without clearly thinking through the consequences of his acts.

### DISCUSSION

### I

■ Appellant first contends the court erred in giving the felony-murder special-circumstance instruction in the disjunctive. The jury was instructed: "To find that the special circumstance referred to in these instructions as murder in the commission of robbery is true, it must be proved, first, that the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery, *or*, two, that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection. [¶] In other words, the special circumstance referred to in these instructions is not established if the attempted robbery or robbery was merely incidental to the commission of the murder." (Italics added.)

Appellant argues that use of the disjunctive "or" lessened the People's burden of proof because it allowed the jury to impose special circumstances if it merely found he killed the victim during a robbery, without requiring it to make the additional finding that the killing was in furtherance of the

robbery or to escape detection. Respondent concedes the instruction was erroneous, but contends it was harmless in light of the surrounding instructions, the strength of the evidence, and the prosecutor's closing argument.

Section 190.2, subdivision (a)(17) imposes death or life imprisonment without parole on a defendant guilty of first degree murder if the murder was committed while the defendant was engaged directly or as an accomplice "in the commission of" one of eleven enumerated felonies, including robbery. (§ 190.2, subd. (a)(17)(i).) Discussing what constitutes "during the commission of" one of these enumerated felonies, *People* v. *Green* (1980) 27 Cal.3d 1, 59, 61-62 [164 Cal.Rptr. 1, 609 P.2d 468] observed that the Legislature intended that each special circumstance listed in the statute "provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not. . . . [¶] The Legislature's goal is not achieved, however, when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder . . . ." (*Id.*, at p. 61, fn. omitted.) "A murder is not committed during a robbery within the meaning of [§ 190.2, subd. (a)(17)(i)] unless the accused has 'killed in cold blood in order to advance an independent felonious purpose, e.g., [has] carried out an execution-style slaying of the victim of or witness to a holdup . . . .' " (*People* v. *Thompson* (1980) 27 Cal.3d 303, 322 [165 Cal.Rptr. 289, 611 P.2d 883], italics omitted, quoting *People* v. *Green*, *supra*, at p. 61; see also *People* v. *Williams* (1988) 44 Cal.3d 883, 928 [245 Cal.Rptr. 336, 751 P.2d 395].)

CALJIC No. 8.81.17 (1991 rev. ed.), the felony-murder special-circumstance instruction, was given in this case, with one significant difference: it uses the conjunctive "and" instead of the disjunctive "or." The portion of CALJIC No. 8.81.17 requiring a finding that the killing was to advance, facilitate the escape from or avoid detection of the underlying felony distinguishes a felony-murder special circumstance from first degree felony murder, which requires only that the killing occur during the commission or attempted commission of the underlying felony. (See § 189; *People* v. *York* (1992) 11 Cal.App.4th 1506, 1510-1511 [15 Cal.Rptr.2d 66]; CALJIC No. 8.21.)

Appellant urges that the error in giving CALJIC No. 8.81.17 in the disjunctive is to be measured under the reasonable doubt standard of *Chapman* v. *California* (1966) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Respondent does not adopt a firm position on whether the *Chapman* or *Watson* (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]) standard of harmless error analysis applies, but contends, and we agree that the error is harmless under either standard.

In *People* v. *Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127], a post-*Green* crime, the defendant asked that the jury be instructed pursuant to CALJIC No. 8.81.17, that to find the special circumstance true it had to be proved that the murder was committed to carry out or advance the commission of arson, or to facilitate the escape therefrom or to avoid detection; and that the special circumstance was not established if the arson was merely incidental to the commission of murder. The requested instruction was denied and the jury was simply instructed that to find the special circumstance true it must be proved that the murder was committed while the defendant was engaged in the commission or attempted commission of arson. (50 Cal.3d at p. 607, fn. 14.) *Clark* held that refusal of CALJIC No. 8.81.17 was error because there was evidence that defendant's intent in setting fire to the victim's house was to kill its inhabitants. However, "[b]y any standard the error was harmless," because there was overwhelming evidence that the defendant started the fire to drive the victims out of the house, so he had a purpose independent of causing death in the commission of arson. (50 Cal.3d at p. 609.)

In the instant case there was no evidence that reasonably or rationally suggests that appellant took the victim's property as a mere incident to murdering him. Instead, the evidence points ineluctably to an intent to rob that degenerated into a killing. The jury was instructed that a robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property. Despite having taken all the victim's property he apparently intended to take, appellant was not in unchallenged possession thereof or in a place of safety as long as he remained in the victim's presence. Appellant's remark to the victim that he could not depart because he had seen appellant's face and could now identify him strongly implies that appellant killed the victim to facilitate completion of the robbery, i.e., assure that the property remained in his possession and that he was safe from detection.

Additionally, the prosecutor's closing argument emphasized that appellant's purpose in killing the victim was "to get rid of the witness who was right there during the robbery," and that the killing was more than an accidental death during a robbery; it was a deliberate killing to eradicate the robbery victim who could identify appellant. Using the conjunctive "and," the prosecutor stated: "Once you unanimously get to first-degree murder, then you consider the special circumstance. And it's basically the same question just asked a slightly different way. That the murder was in the commission or attempted commission of a robbery[,] *and* that the murder was committed in order to carry out or advance the commission or attempted

commission of the robbery or to facilitate the escape therefrom, or, as is perhaps the most significant or gut-wrenching aspect of this robbery, it was to avoid detection. [¶] In other words, what it also makes clear is that the robbery or attempted robbery can't just be incidental to the killing. In this fact circumstance, that's not even questioned, because the killing, not only was it not incidental to the robbery, the robbery was the whole motive . . . for the killing, to avoid detection, to finish the crime off." (Italics added.)

In light of the evidence and the prosecutor's argument, the failure to give CALJIC No. 8.81.17 in the conjunctive was harmless under either *Chapman* or *Watson*.

We observe that our resolution of this issue might have been much simpler if the record contained the instructions provided to the jury during its deliberations. Section 1127 requires that the court sign all proposed instructions, identifying the proponent and noting whether the instruction was given, refused, or modified. California Rules of Court, rule 33(a)(1)(h)[2] requires that written instructions given or refused be included in the record on appeal. This record does not contain the instructions proposed by the parties. It indicates that appellant, the People and the court each prepared a list of instructions, but the parties did not formally submit their lists because they accepted the court's suggested list, as revised during an unreported discussion. The court then listed for the record the final instructions by their CALJIC number, including CALJIC No. 8.81.17.

At the outset of instructing on March 15, the jury was informed that it would receive a copy of the instructions "at the conclusion of the case." Instructions were completed and the jury sent out to deliberate on the morning of March 16. Immediately afterward, counsel stipulated that the instructions as given could could go to the jury. The clerk's transcript contains a "Request by the Jury" dated March 16 for the instructions.

In the afternoon of March 16 the jury was called back into the courtroom for clarification on special circumstance unanimity because, after deliberations were underway, defense counsel expressed concern that the jury might not understand that although unanimity of a first degree murder theory was unnecessary for conviction, it was required for the felony murder special circumstance. Before giving the clarification, the court remarked that the jury's request for the written instructions had been received and, it assumed, honored. The record contains no negative reply from any juror or court personnel.

The clerk's transcript contains instructions typed by the reporter that are essentially the same as the instructions transcribed from the court's oral

---

[2]Unless otherwise indicated, all further rule references are to the California Rules of Court.

instructions of March 15 and March 16, minus incidental comments from counsel. However, these instructions are file-stamped July 12, long after the trial was completed.

We received a certificate from the county clerk that it is the practice not to include for the file the actual written instructions used (and presumably given to the jury), but to have the court reporter transcribe them and file the transcription of the court's oral instructions for the record. Consequently, we cannot determine whether the written instruction (CALJIC No. 8.81.17) received by the jury for use during deliberations was in the correct conjunctive form, or in the incorrect disjunctive form as the reporter's transcript indicates. To avoid this sort of problem, the written instructions provided to the jury for use in deliberation should be preserved and filed for the record. This could avoid reversals in closer cases.

### II-VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The superior court shall prepare and forward to the Department of Corrections a modified abstract of judgment reflecting 409 days of presentence credits. The judgment is otherwise affirmed.

Peterson, P. J., and King, J., concurred.

A petition for a rehearing was denied January 13, 1995, and appellant's petitions for review by the Supreme Court were denied March 30, 1995. Kennard, J., Baxter, J., and George, J., were of the opinion that the petitions should be granted.

---

*See footnote, *ante*, page 1758.