[No. S027555. Apr. 21, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFREDO PRIETO, Defendant and Appellant.

228

## COUNSEL

Andrew E. Rubin and Terrence V. Scott, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Holly D. Wilkens and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death under the 1978 death penalty law. Following a jury trial, defendant Alfredo Prieto was convicted of: (1) one count of first degree murder (§ 187, subd. (a); count 12) with a robbery-murder, a kidnapping-murder, and a rape-murder special circumstance (§ 190.2, subd. (a)(17)); (2) two counts of attempted willful, deliberate, and premeditated murder (§ 187, subd. (a); former § 664, subd. (1), as amended by Stats. 1986, ch. 519, § 2, p. 1859;[2] counts 13, 14); (3) two counts of attempted robbery (§§ 211, 664; counts 1, 4); (4) two counts of robbery (§ 211; counts 2, 3); (5) three counts of kidnapping for robbery (§ 209, subd. (b); counts 5, 6, 7); (6) three counts of forcible rape (former § 261, subd. (2), as amended by Stats.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] All further references to section 664 are to the former version as amended by Statutes 1986, chapter 519, section 2, page 1859.

1986, ch. 1299, § 1, p. 4592;[3] counts 8, 9, 10); and (7) one count of possession of a firearm by a felon (§ 12021, subd. (a); count 15). The jury also found true the allegations that: (1) a principal was armed with a firearm as to count 1 (§ 12022, subd. (a)(1)); (2) a principal was armed with a handgun as to counts 2 through 10 and 12 through 14 (§ 12022, subd. (a)); (3) defendant personally used a firearm as to counts 2 through 10 and 12 through 14 (§§ 12022.5, 1203.06, subd. (a)(1)); (4) defendant personally inflicted great bodily injury as to counts 4, 7, and 10 (§ 12022.7); and (5) defendant had been previously convicted of the serious felony of assault with a firearm as to counts 1 through 10 and 12 through 15 (§ 667, subd. (a)). The jury, however, acquitted defendant on the alternative charge of attempted forcible rape (§§ 261, subd. (2), 664; count 11).

In the penalty phase, the jury returned a verdict of death. After denying defendant's motion for a new trial and reduction of the penalty (§ 190.4), the trial court imposed the death penalty for the murder and a sentence of 47 years and four months, followed by two life terms with the possibility of parole and three life terms without the possibility of parole.

On review, we strike the serious felony enhancement as to count 15 and amend the abstract of judgment to reflect a sentence of life with the possibility of parole as to counts 5, 6 and 7, but affirm the judgment in all other respects.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution

On September 1, 1990, Lisa H. and her best friend, Yvette Woodruff, picked up Emily D., Lisa H.'s mother, from her workplace around 11:30 p.m. and took her home. At her home in San Bernardino County, Emily D. saw Anthony "Cookie" Rangel, her nephew and next-door neighbor, and Connie Ramirez, the sister of Emily's former classmate, and spoke briefly with them. Ramirez invited Emily D. to her place for drinks, and Emily D. accepted the invitation. Emily D. left for Ramirez's house around 1:30 a.m., but drove around for awhile when she spotted police officers in front of the house. She returned to Ramirez's house after the officers left, but left again to return home and pick up some beer she had forgotten to bring.

On her way home, Emily D. spotted Lisa H. and Woodruff driving and stopped to speak with them. They then decided to go to Ramirez's house

---

[3]All further references to section 261 are to the former version as amended by Statutes 1986, chapter 1299, section 1, page 4592.

together. At Ramirez's house, Emily D. parked in the driveway, and Lisa H. and Woodruff parked parallel to the street, blocking the driveway. Unbeknownst to the three women, they had interrupted a robbery. Just before their arrival, some men had grabbed Rangel from a van in the driveway and rifled through his wallet. One man wielded a knife; another had a gun. When the three women arrived, the men left Rangel, who fled.

The men then turned their attention to the new arrivals. Upon reaching Emily D.'s car, Vincent Lopez put a knife to her throat and demanded her car keys and money. She complied. Meanwhile, defendant—identified by a large "PNS" tattoo on his neck—and Danny Sorian walked toward Lisa H.'s car. Sorian approached Woodruff, while defendant pointed a gun at Lisa H.'s head, threatened to "blow" her "fucking head off," and demanded her car keys and money. She complied, and defendant and Sorian herded her and Woodruff into the backseat. Soon after, Lopez forced Emily D. at knifepoint into the backseat with the other women. The three men then got into the front seat. After Lisa H. identified the correct key, defendant started the car and drove away.

One of the men turned up the radio, making it difficult for the women to hear their conversation. Lisa H. was hysterical and crying, but managed to lift her head periodically and look around. Emily D. kept her head down and eyes closed. Lopez asked defendant and Sorian to let the women go and told them to let him out if they did not because he did not want to go back to prison.[4] Defendant later stopped and Lopez left.

After defendant and Sorian made several stops in an apparent effort to find a replacement for Lopez, Ricardo Estrada joined them. When they stopped for gas, defendant and Estrada got out. Pointing a gun, Sorian reassured the women they would not be hurt if they did what they were told. When defendant and Estrada returned, they drove off again. After getting stuck in the mud once, the three men and their victims reached a dark and isolated field in the City of Ontario.

At the field, each man took charge of a victim. Sorian took Emily D. Defendant initially chose Lisa H. But when she pulled away, he pulled Woodruff, struggling and resisting, from the car and dragged her toward some trees. Estrada then took Lisa H.

Sorian raped Emily D., while Estrada raped Lisa H. During the rape, Emily D. saw Woodruff on the ground struggling with someone on top of her and heard her scream. She also saw Lisa H. on the ground with someone

---

[4]Lopez had been paroled less than one month before this incident.

on top of her and heard Lisa H. cry and scream out for her. Meanwhile, as she was being raped, Lisa H. saw Woodruff's legs and heard Woodruff say, "Emily, please get him off of me. Emily, he's hurting me."

After raping Emily D., Sorian told her to put her clothes back on, pulled a knife out and told her not to tell anybody about "what happened out" here or he would "come back and finish" them "off." He then said he didn't "like how these guys are acting, and that he's just going to have to go and take care of them" and walked away. When Estrada finished with Lisa H., Sorian ordered her to put her clothes back on and took her to her mother, where the two women hugged each other. While embracing, they heard a gunshot, and Lisa H. saw a man walk away from Woodruff. She knew the man was not Sorian or Estrada because she could see them standing inside a building.

After the gunshot, Emily D. and Lisa H. were separated. Estrada repeatedly stabbed Lisa H. in the neck and hands and broke his knife blade on her knuckle. After being stabbed and kicked, Lisa H. lay on the ground and pretended she was dead. At the same time, Sorian was stabbing Emily D. When Sorian stopped, Emily D. called out to Lisa H. and asked her if she was all right. Sorian then screamed, "I thought I told you to keep your fucking mouth shut" and stabbed her again, causing Emily D. to lose consciousness.

When she heard the car drive off, Lisa H. ran to Emily D. and helped her up. Together, they went to help Woodruff, but Woodruff did not respond. Emily D. and Lisa H. then ran for help. During their run for help, Emily D. told Lisa H. they should lie and tell the police they were blindfolded, because their attackers might return to kill them.

The two women eventually found a security guard at a Kmart distribution center who called the police. The police arrived around 4:00 a.m., and one of the officers spoke with Lisa H. As instructed by Emily D., Lisa H. lied to the officer. Lisa H. then directed the officers to the site of the attacks. At the site, the officers discovered Woodruff's body propped up against a tree with her legs spread apart. One officer thought she had a faint pulse. The paramedics took over and pronounced Woodruff dead at 4:15 a.m.

An autopsy established that Woodruff had died of a gunshot wound to the head. The muzzle of the gun was touching her head, and she probably died within minutes after being shot. The autopsy also revealed abrasions at the entrance to Woodruff's vagina and on her upper back. These abrasions occurred immediately before her death. Woodruff also had some bruising of the hymen, which could have occurred up to one day before her death.

Finally, she had numerous postmortem ant bites on the inner side of her thighs.

After discovering Woodruff's body, some officers took Lisa H. to a hospital. Other officers took Emily D. to a different hospital, where she was hospitalized for four days. The police then secured the crime scene and searched for evidence. During the search, the police collected shell casings and Woodruff's clothes. Although an initial screen suggested that there was semen on Woodruff's underwear, subsequent testing detected no semen on her clothes or body. The police also discovered a broken knife blade at the crime scene. The blade, however, contained no fingerprints or blood and did not appear dirty.

At the hospitals, Emily D. and Lisa H. received treatment. Sexual assault kits were obtained, and the police photographed the women and collected their clothing. Serological testing uncovered semen on Emily D.'s vaginal swabs and underwear. Forensics could not, however, connect the semen to any suspect. Testing also uncovered no semen on Lisa H.'s vaginal swabs. Although an initial screen suggested the presence of semen on Lisa H.'s underwear, subsequent testing could not confirm this finding. A foreign antigen, probably from saliva and linked to Estrada and no other suspect, was discovered on Lisa H.'s sweater jacket. None of the serological evidence, however, connected defendant to the crimes.

On the morning after the attack, an officer interviewed Lisa H. at the hospital. Lisa H. lied and told the officer she had been blindfolded and could not recognize any of the assailants because it was too dark. Because Lisa H.'s statements appeared inconsistent, the officer suspected she was lying or withholding information.

Later that morning, a detective conducted a videotaped interview of Lisa H. Although the detective told Lisa H. that a bloodbath might occur if the Black Angels found out who killed Woodruff before the police did, Lisa H. continued to lie. She falsely told the detective that she was blindfolded during the rape and that she could not remember the faces of her attackers because "it was too dark." She also mistakenly told the detective that the driver had jumped into another car at the gas station.

At trial, Lisa H. testified that she initially lied because she was scared her attackers would kill her if she told the truth. She, however, decided to tell the truth after her grandparents picked her up from the hospital and she finally realized Woodruff was dead. That afternoon, Lisa H. visited Emily D. at the hospital and told her she was going to tell the truth.

On September 5, Lisa H. identified defendant in a photo lineup as the person who sexually assaulted and murdered Woodruff. She also identified Estrada as her rapist in a different photo lineup, but could not identify anyone in the two other photo lineups. After Lisa H. made her identifications, the police showed the same four photo lineups to Emily D. Emily D. also identified defendant, but claimed he left the car before their attackers took them to the field. She also identified Estrada as her daughter's rapist and thought that Frank Lopez, the brother of Vincent Lopez, looked familiar.

A week later, Lisa H., after seeing defendant's photograph in a newspaper article, identified defendant as Woodruff's killer by sight and by voice at a live lineup. Emily D. also identified defendant by sight and by voice at the live lineup. After recognizing defendant's voice, Emily D. realized that defendant had not left the car as she had suggested at the photo lineup. At a subsequent live lineup, Emily D. identified Vincent Lopez as the man who robbed her at Ramirez's house and left the car before they went to the field. Finally, in two other live lineups, the women identified Estrada as Lisa H.'s rapist and Sorian as Emily D.'s rapist.

Based on the initial identifications at the photo lineup, the police obtained a warrant to search defendant's apartment, where he lived with Lillian Gutierrez. During the search, the police discovered a key ring with five keys on top of a wall heater in the bedroom. These keys resembled a set of keys given to the police by Lisa H. or Emily D. One key opened the gas cap of Lisa H.'s car, and another key started the car. When the police showed Lisa H. the keys, she identified four of the five keys. A few days before trial, she remembered that the fifth key opened a security gate at her friend's building. The police later confirmed that this key opened that security gate.

### 2. Defense

Gutierrez testified that defendant was at home with her and her children on September 1. According to Gutierrez, defendant was in the apartment when she went to sleep between 11:00 p.m. and midnight and when she woke up the next morning. Gutierrez also testified that she saw no scratches on defendant that week.

### 3. Rebuttal

The prosecution presented no rebuttal witnesses.

### B. Penalty Phase

### 1. Prosecution

Sandra Figueroa, defendant's former wife, testified that defendant once threw their daughter at her after she asked him to hand the child over.

Although Figueroa failed to catch their daughter, the child was not injured. Defendant subsequently threatened Figueroa in connection with this incident and others.

Figueroa also testified that defendant hit and slapped her on several occasions and forced her to have sex with him. During some of these incidents, defendant threatened Figueroa. On another occasion, defendant hit Figueroa with an extension cord and forced her to have sex with him. Figueroa also described an incident where defendant pointed a gun at her head. When Figueroa bent down to pick something up, the gun went off and the bullet hit a frame behind her. Finally, Figueroa testified that defendant once twisted her arm and pushed a knife into her back.

Elias Vera and Mario Naranjo testified about a 1984 shooting incident involving defendant. According to Naranjo, defendant drove by his house and shot at him, his girlfriend, Mercedes Salazar, and Vera while they were standing in his front yard. Defendant hit Naranjo and Vera in the legs.

Stella Quinones testified that defendant drove up to her, her husband, her sister, and her brother-in-law five days after Woodruff's murder and pointed a gun at her husband. Defendant demanded to know where they were from. When someone called for defendant, he left.

Finally, Deputy Sheriff Marvin Morton testified that he discovered two "pieces of metal that [are] refer[ed] to as shanks wrapped with strips of cloth to fashion as a handle" in defendant's cell while he was awaiting trial. The sharpened metal shanks were hidden in a recessed area on the floor underneath defendant's bunk. The shanks were six to seven inches long and approximately two inches wide. Only defendant and law enforcement personnel had access to the cell. Defendant later admitted that the shanks were his, but claimed that he possessed them only for protection.

### 2. *Defense*

Teodora Alvarado, defendant's mother, testified that she came to the United States in 1975 and left her children, including defendant, with her father in El Salvador. According to Alvarado, El Salvador was "very bad" when defendant was living there. She returned to El Salvador in 1981 after her father was murdered and brought her children to the United States.

Alvarado further testified that Sandra Figueroa was a gang member and a liar and introduced defendant to gangs. Before he met Figueroa, defendant had been doing well in school. Finally, Alvarado stated that defendant was always kind to children and was never abusive toward Figueroa.

Yolanda Loucel, defendant's sister, testified that their childhood in El Salvador was marked by constant warfare and killing. Their father used to beat their mother, and guerillas murdered their grandfather in front of defendant. According to Yolanda, defendant joined a gang after he married Figueroa, who was a gang member. She also claimed that defendant was a good father.

Guillermo Prieto, defendant's brother, testified that their father had a drinking problem and abused their mother. According to Guillermo, El Salvador was a violent place, with bullets flying and dead bodies everywhere. He, defendant, and their other siblings left El Salvador with their mother after guerillas murdered their grandfather.

Guillermo also testified that he dated Figueroa before she married defendant. Figueroa was a gang member who introduced him and defendant to gangs. He claimed defendant joined a gang to impress Figueroa and that she wanted to get revenge on defendant because he left her. He also believed that Figueroa had been cheating on defendant with Naranjo during their marriage. Finally, Guillermo testified that defendant was not abusive to Figueroa and took good care of their daughter.

Hector Loucel, defendant's brother-in-law, testified that he had known defendant for 10 years and had worked with defendant for six months. According to Hector, defendant was a good and dependable worker. Hector also testified that he trusted defendant with his children and that defendant had always been "a great guy."

James Park, a psychologist and the former Chief of Classification, Administrative Director of Death Row, and Assistant Director of the Department of Corrections for Policy in the California prison system, described the stringent security measures and rigid routines used at a "level four" prison. Based on his review of defendant's custody records, he opined that defendant would adjust well to prison and "do useful work."

Finally, Richard Hall, a clinical psychologist with a Ph.D. in neuroscience, testified that defendant did not suffer from psychosis or posttraumatic stress disorder and did not have antisocial personality disorder. Defendant did, however, have difficulty making friends because of his reaction to his father's abuse of his mother and the death of his grandfather. In Hall's opinion, defendant was not overly aggressive and would adjust well to prison life.

3. *Rebuttal*

In rebuttal, Figueroa testified that she was not a gang member. James Kabler, a Tehachapi State Prison corrections officer assigned to investigate

inmate crime, testified that there are serious assaults and murders in level four prisons involving innocent looking items such as combs and toothbrushes. He described one such assault directed at a civilian employee in the prison. Kabler also testified that there had been one escape from the level four facilities at Tehachapi during the past seven years.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Insufficiency of the Evidence*

██ Defendant contends his conviction on count 10 for raping Woodruff should be reversed because there was insufficient evidence that he and Woodruff were not married. (See § 261 [stating that the rape victim must not be "the spouse of the perpetrator"].) We disagree.

██ "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence-evidence that is reasonable, credible and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) ██ Where the marital status of the victim is at issue in a rape case, "[t]he unmarried status of the victim need not be shown by direct evidence [citation], but may be demonstrated by circumstantial evidence where no direct question is asked." (*People v. Smith* (1968) 263 Cal.App.2d 631, 636 [69 Cal.Rptr. 670], judg. vacated by *In re Smith* (1970) 3 Cal.3d 192 [90 Cal.Rptr. 1, 474 P.2d 969].)

Although the record contains no direct evidence that defendant and Woodruff were not married to each other, it contains more than enough circumstantial evidence to support such a finding. First, Woodruff was only 15 and had a boyfriend, Angel Marines. Second, Woodruff lived at home with her mother, while defendant lived in an apartment with his girlfriend, Gutierrez. Finally, neither Lisa H., Woodruff's "best friend," nor Emily D., Lisa H.'s mother, recognized defendant before this incident. Viewed in the light most favorable to the judgment, this evidence supports the jury's finding that defendant and Woodruff were not married to each other at the time of the alleged rape.

#### 2. *Erroneous Admission of Entomological Evidence*

██ Defendant contends expert testimony relating to ants and the presence of semen on Woodruff should have been excluded under the *Kelly/Frye*

test for determining the admissibility of scientific evidence. (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013.) According to defendant, the erroneous admission of this testimony warrants reversal of his conviction on count 10 for the rape of Woodruff and the jury's finding of the rape-murder special circumstance. Even assuming this testimony should have been excluded, we find its admission harmless.

### a. *Facts*

At trial, the prosecution sought to introduce expert testimony from David Faulkner, an entomologist, who had examined the ants found at the crime scene and photographs of Woodruff's body. In her offer of proof, the prosecutor stated that Faulkner would testify that the ants were probably attracted to a protein source like semen. Claiming that there was no scientific basis for Faulkner's testimony and that the prejudicial effect of his testimony outweighed its probative value, defendant objected under Evidence Code sections 801 and 352. Defendant also asked the court to conduct a hearing outside the presence of the jury to determine the admissibility of this testimony. The trial court, however, overruled defendant's objections and refused to conduct a hearing.

At the beginning of Faulkner's testimony, defendant challenged his qualifications. During the ensuing voir dire, Faulkner testified that he was completing a master's degree in forensic entomology and was the curator of entomology at the San Diego Natural History Museum. Although he had testified as an expert four times in the past and had been involved in 30 or so cases, only two or three of these cases involved ants. He further testified that he had no expertise in "the area of bodily fluids" and had never conducted any experiments with ants and seminal fluid. Faulkner, however, noted that he had once investigated fire ant attacks on baboons. Based on his review of the literature and his discussions with zoo personnel, he had determined that the ants were attracted to seminal fluid from the baboons. Following voir dire, the trial court overruled defendant's objection to Faulkner's qualifications.

Faulkner then testified that he had investigated ant attacks on zoo animals on several occasions, including one that involved primate seminal fluid. In that case, semen from primates—which is similar to human semen—appeared to attract ants. He then identified the ants from the crime scene as fire ants and, based on photos of Woodruff's body, observed that the ants were concentrated around Woodruff's head and pubic area. Based on these observations, Faulkner opined that the ants in Woodruff's pubic area were likely

feeding on semen. Faulkner also stated that the ants could have consumed all the semen in Woodruff's pubic area.

b. *Discussion*

■ The erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*); see also *People v. Venegas* (1998) 18 Cal.4th 47, 93 [74 Cal.Rptr.2d 262, 954 P.2d 525] [applying *Watson* standard to the erroneous admission of expert testimony].) ■ Defendant contends it is reasonably probable the jury would not have convicted him of the rape of Woodruff without Faulkner's testimony because, without this testimony, the jury would not have found that he had engaged in "an act of sexual intercourse." (§ 261.) We disagree.

Even without Faulkner's testimony, there was ample evidence of sexual intercourse. This evidence included: (1) fresh abrasions at the entrance of Woodruff's vagina and on her back inflicted just before her death; (2) Woodruff's state of undress from the waist down; (3) Woodruff's physical struggles with defendant as he lay on top of her; (4) Woodruff's statements that defendant was "hurting" her; and (5) bruising of Woodruff's hymen that occurred at most 24 hours before her death. Moreover, the evidence established that defendant and his two cohorts separated the three victims with the intent to rape them, and that his two cohorts did rape their victims. The prosecution also offered alternative explanations for the absence of semen. For example, a forensic pathologist testified that semen rapidly degenerates if the body is not refrigerated. A criminalist also explained that the absence of semen does not necessarily mean that no sexual activity occurred. In light of this evidence, there is no reasonable probability defendant would have obtained a more favorable result absent Faulkner's testimony. (*Watson, supra*, 46 Cal.2d at p. 836.) Accordingly, we find no reversible error.

3. *Instructional Errors*

Defendant alleges numerous instructional errors at the guilt phase. The People contend defendant waived these claims because he either failed to object or failed to raise the specific objection presented on appeal before the trial court. ■ These instructional errors, however, are reviewable on appeal to the extent they "affect[] his substantial rights." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1199 [120 Cal.Rptr.2d 477, 47 P.3d 262]; see also § 1259.) Accordingly, we address the merits of defendant's claims of instructional error below.

### a. *Failure to Limit CALJIC No. 2.15 to Theft Offenses*

Although the trial court gave the jury the standard version of CALJIC No. 2.15, the court did not limit the instruction to theft-related offenses as suggested by the use note. (See Use Note to CALJIC No. 2.15 (5th ed. 1988) p. 40 ["This instruction will serve to cover the effect of possession of recently stolen property in robbery, burglary, theft and receiving stolen property"].) Instead, the court instructed the jury that: "If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant ALFREDO PRIETO is guilty of the *crimes charged*."[5] (Italics added.) Defendant contends the application of CALJIC No. 2.15 to defendant's nontheft offenses-i.e., rape and murder-was improper because it encouraged jurors to draw impermissible inferences favorable to the prosecution and lowered the prosecution's burden of proof. (See *People v. Barker* (2001) 91 Cal.App.4th 1166, 1176 [111 Cal.Rptr.2d 403] (*Barker*).) The People counter that *Barker* was wrongly decided and that the permissive inference described in CALJIC No. 2.15 may be applied to nontheft offenses. We find *Barker* persuasive and hold that the trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder was improper. We, however, find this instructional error harmless.

Initially, we reject defendant's contention that the trial court's instruction mandates reversal because it lowered the prosecution's burden of proof. CALJIC No. 2.15 did not directly or indirectly address the burden of proof, and nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt. Moreover, other instructions properly instructed the jury on its duty to weigh the evidence, what evidence it may consider, how to weigh that evidence, and the burden of proof. In light of these instructions, there is "no possibility" CALJIC No. 2.15 reduced the prosecution's burden of proof in this case. (*Barker*, *supra*, 91 Cal.App.4th at p. 1177.)

Nonetheless, we agree with defendant that the trial court's application of CALJIC No. 2.15 to nontheft offenses like rape or murder was

---

[5] The full instruction stated: "If you find that a defendant was in conscious possession of recently stolen property, the fact of such possession is not by itself sufficient to permit an inference that the defendant ALFREDO PRIETO is guilty of the crimes charged. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession-time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, any other evidence which tends to connect the defendant with the crime charged."

erroneous. We have approved the use of CALJIC No. 2.15 with respect to theft offenses because, "[w]ith the inference from the knowledge and conscious possession of [stolen] property, and slight additional evidence as corroboration, the intent to steal, identity, and the determination a defendant committed the acts necessary to constitute robbery and burglary have been found to naturally and logically flow . . . ." (*Barker, supra,* 91 Cal.App.4th at p. 1176, fn. 6.) The same is not true for nontheft offenses like rape or murder. As explained in *Barker,* "[p]roof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed" a rape or murder. (*Id.* at p. 1176.) We therefore find the trial court's inclusion of nontheft offenses like rape and murder in CALJIC No. 2.15 erroneous.

This error, however, was not prejudicial because there was no reasonable likelihood the jury would have reached a different result if the court had limited the permissive inference described in CALJIC No. 2.15 to theft offenses. (See *Watson, supra,* 46 Cal.2d at p. 836.) Both surviving victims identified defendant on numerous occasions as the man who sexually assaulted and murdered Woodruff, and Sorian and Estrada as the men who raped them. Their unrebutted testimony also established that the murder was committed in the course of the robberies, kidnapping, and rapes. Given this overwhelming evidence of defendant's guilt on the nontheft offenses, no prejudicial error could have occurred. (See *Barker, supra,* 91 Cal.App.4th at p. 1176.)

### b. *Erroneous Conspiracy Instructions*

Although the prosecution did not charge defendant with conspiracy, it alleged conspiracy as one of the theories of liability for counts 1 through 14. The trial court therefore gave various conspiracy instructions. In instructing the jury on the vicarious liability of a conspirator for the acts of a coconspirator, the trial court used a number of standard conspiracy instructions, including CALJIC Nos. 6.11, former 6.15, 6.16 and 8.26. The trial court did not, however, include CALJIC No. 6.25—which required the jury to agree unanimously on the crimes defendant conspired to commit—and CALJIC No. 6.26—which contained the verdict form for such a jury finding—presumably because the information did not separately charge defendant with conspiracy. According to defendant, this omission constitutes reversible error because the jury could have convicted defendant under a conspiracy theory even if the crime was not a natural and probable consequence of the conspiracy. Defendant, however, misreads the instructions given by the trial court.

Contrary to defendant's assertions, the instructions correctly informed the jury that a conspirator may be vicariously liable for a crime committed in

furtherance of a conspiracy only if that crime was a natural and probable consequence of the conspiracy. CALJIC No. 6.11, as given by the trial court, states in relevant part: "You [the jury] must determine whether the defendant is guilty as a member of a conspiracy to commit the crime originally contemplated, and, if so, whether the crimes alleged were a natural and probable consequence of the originally contemplated criminal objective of the conspiracy." As defendant concedes, this instruction properly informed the jury that it could not find defendant guilty under a conspiracy theory if the charged crime was not the natural and probable consequence of the conspiracy. Neither CALJIC former No. 6.15[6] nor CALJIC No. 6.16[7] contradicts CALJIC No. 6.11 or suggests otherwise. Likewise, CALJIC No. 8.26[8]—which defines a defendant's liability for killings in furtherance of a conspiracy—correctly states the law and does not suggest that a conspirator may be guilty of a charged crime if that crime was not a natural and probable consequence of the conspiracy. Thus, the instructions did not contain "varying and irreconcilable standards."

Even assuming the instructions were erroneous, defendant shows no prejudice. According to defendant, the alleged instructional error requires reversal because the jury had no way of knowing how to limit his liability if it found that he had left the car before the rapes and murder and had withdrawn from the conspiracy. Defendant, however, does not explain how the alleged error could have confused the jury on that point. Indeed, the court instructed the jury with CALJIC No. 6.20[9]—which correctly defined the limitations on liability for conspirators who withdraw from the conspiracy. Finally, the jury necessarily concluded that defendant did not leave

---

[6]CALJIC former No. 6.15, as given, stated: "No act or declaration of a conspirator that is an independent product of his own mind and is outside the common design and not a furtherance of that design is binding upon his co-conspirators, and they are not criminally liable for any such act."

[7]CALJIC No. 6.16, as given, stated: "Where a conspirator commits an act which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefore attaches to any of his confederates."

[8]CALJIC No. 8.26, as given, stated: "If a number of persons conspire together to commit robbery, kidnapping, and rape, and if the life of another person is taken by one or more of them in furtherance of the common design, and if such killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose, all of the co-conspirators are deemed in law to be equally guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

[9]CALJIC No. 6.20, as given, stated: "Any member of a conspiracy may withdraw from and cease to be a party to the conspiracy but his liability for the acts of his co-conspirators continues until he effectively withdraws from the conspiracy. [¶] In order to effectively withdraw from a conspiracy, there must be an affirmative and bona fide rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge. [¶] If a member of a conspiracy has effectively withdrawn from the conspiracy he is not thereafter liable for any act of the co-conspirators committed subsequent

the car before the rapes and murder because it found that defendant personally used a firearm in murdering Woodruff. Accordingly, we find no reversible error.

### c. *Failure to Identify and Require Juror Unanimity as to Specific Overt Acts*

Defendant contends the trial court erred by failing to instruct the jury that it had to agree unanimously on specific overt acts in order to find him guilty under a conspiracy theory and by failing to identify the alleged overt acts. We recently rejected these contentions in *People v. Russo* (2001) 25 Cal.4th 1124, 1135 [108 Cal.Rptr.2d 436, 25 P.3d 641]. ■ As we explained, "[d]isagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy." (*Ibid.*) As conceded by defendant, the trial court properly defined overt acts for the jury. Accordingly, defendant's contention fails.

### d. *Failure to Give CALJIC No. 6.24*

During the trial, numerous hearsay statements from defendant's alleged coconspirators were admitted into evidence without objection. Because the jury could not consider these statements before making some preliminary findings, defendant contends the trial court erred by omitting CALJIC No. 6.24,[10] which describes the criteria for considering a coconspirator's hearsay statements. "Assuming the court had a sua sponte duty to so instruct the jury under these circumstances," the error was harmless. (*People v. Sully* (1991) 53 Cal.3d 1195, 1231 [283 Cal.Rptr. 144, 812 P.2d 163].) Even if the jury had not considered the few hearsay statements defendant identified, it is not reasonably probable the jury would have reached a different result. (See *id.* at pp. 1231-1232.) In any event, the evidence overwhelmingly established that these hearsay statements were made during and in furtherance of a

---

to his withdrawal from the conspiracy, but he is not relieved of responsibility for the act of his co-conspirators committed while he was a member."

[10]CALJIC No. 6.24 states: "Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine: [¶] 1. That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed; [¶] 2. That the statement was made while the person making the statement was participating in the conspiracy and that the person against whom it was offered was participating in the conspiracy before and during that time; and [¶] 3. That such statement was made in furtherance of the objective of the conspiracy. [¶] The word 'statement' as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by that person as a substitute for oral or written verbal expression." (CALJIC No. 6.24 (1995 rev.) (5th ed. 1988) p. 99.)

conspiracy to rob, kidnap, and rape the three victims. Accordingly, no prejudicial error occurred.

### e. *Failure to Instruct on Target Offenses for Natural and Probable Consequences Rule*

With respect to the "crimes charged," the trial court instructed the jury that defendant could be found guilty if the charged crime was the natural and probable consequence of another crime that he intentionally aided and abetted. Defendant contends the court erred by failing to identify and define the target offenses that could have led to the charged crimes. We, however, find any such error to be harmless.

"In *People v. Prettyman* (1996) 14 Cal.4th 248 [58 Cal.Rptr.2d 827, 926 P.2d 1013], we held that instructions on the 'natural and probable consequences' rule are required only when the prosecution has elected to rely on that theory of accomplice liability, and then, only when substantial evidence supports the theory. When the instruction is given, however, it should identify and define any target offenses allegedly aided and abetted by the defendant. [Citation.]" (*People v. Sakarias* (2000) 22 Cal.4th 596, 627 [94 Cal.Rptr.2d 17, 995 P.2d 152].) If the court fails to identify and define these target offenses, we must then determine whether there is a " 'reasonable likelihood' that the jury misapplied the trial court's instructions on the 'natural and probable consequences' doctrine . . . ." (*Prettyman*, at p. 272.)

In this case, any failure to identify and define the target offenses was harmless error. The prosecution argued, and the evidence established, that defendant personally robbed Lisa H., kidnapped the three women, and sexually assaulted and murdered Woodruff. In personally committing these offenses, defendant necessarily aided and abetted the crimes committed by Lopez, Sorian, and Estrada. In any event, there was no evidence defendant "aided and abetted any noncriminal behavior which led, as a 'natural and probable consequence,' " to the crimes committed by his ·cohorts, "and neither the prosecution nor the defense mentioned any such behavior in their closing arguments to the jury." (*People v. Prettyman, supra*, 14 Cal.4th at p. 273.) Under these circumstances, there is no reasonable likelihood the trial court's failure to identify the target offenses caused "the jury to misapply the 'natural and probable consequences' doctrine" (*ibid.*), and no reasonable probability defendant would have obtained a more favorable outcome absent the alleged instructional error (see *id.* at p. 274).

### f. *Erroneous Instruction Regarding Completion of a Robbery*

The trial court instructed the jury with the fifth edition version (1988) of CALJIC No. 9.44. The instruction stated in relevant part that: "A robbery is

still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. [¶] A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with such property." As the People concede, the instruction was erroneous "because it could have misled the jury into believing that commission of a robbery continues during the escape to a place of temporary safety even if the loot is not being carried away contemporaneously." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1170 [282 Cal.Rptr. 450, 811 P.2d 742].) Assuming the instructional error affected "an element of the offense" (see *id.* at p. 1171), it was harmless beyond a reasonable doubt. In this case, defendant, Sorian, and Lopez simultaneously robbed or attempted to rob three separate victims and then drove off with the loot *together*. Even though Lopez did leave the car at some point and may have left with some of the loot, the initial "act of carrying away the loot to a place of temporary safety *did* in fact coincide with the escape." (*Ibid.*) On these facts, the jury undoubtedly found that defendant formed the intent to facilitate or encourage the commission of the robberies "prior to or during the act of carrying away the loot to a place of temporary safety." (*Ibid.*) Accordingly, the instructional error does not warrant the reversal of any of defendant's convictions.

> g. *Failure to Instruct on Element of Willful, Deliberate and Premeditated Attempted Murder*

Defendant contends the trial court erred when it failed to instruct the jury that he was guilty of willful, deliberate, and premeditated attempted murder (§§ 664, 187) as an aider and abettor only if he *personally* acted with willfulness, deliberation, and premeditation. The People counter that an aider and abettor is guilty of willful, deliberate, and premeditated attempted murder even if he did not personally deliberate or premeditate. We, however, need not resolve this question. Even if we assume the trial court erred by failing to so instruct, reversal is not warranted because the error was harmless under both the federal and state standards.

In this case, the evidence overwhelmingly established that defendant "weigh[ed] and consider[ed] the question of killing" before deciding to aid and abet the attempted murders. Defendant drove his cohorts and the women to an empty field, where each man raped one of the women. His cohorts carried knives with them, and the jury found that defendant personally used a firearm while sexually assaulting and murdering Woodruff. After defendant shot and killed Woodruff, his two cohorts stabbed Emily D. and Lisa H. During the stabbings, defendant asked Estrada, "Did you stab her in the back

of the neck?" In light of this evidence, there is no reasonable doubt the jury would have found that defendant personally acted with willfulness, delibera-tion, and premeditation once it rejected his claims that he either left the car or was home during the attacks. Accordingly, any omission in the instruc-tions, even if erroneous, was harmless under both *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], and *Watson, supra,* 46 Cal.2d at page 836.

### h. *CALJIC No. 2.51*

■ The trial court instructed the jury with the fifth edition version of CALJIC No. 2.51, which stated in relevant part that: "Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence."[11] Defendant contends this instruction impermissibly shifted the burden of proof even though the court gave CALJIC No. 2.90,[12] because the phrase "tend to establish innocence" implied that defendant had the burden of establishing his innocence. We disagree. "CALJIC No. 2.51 [does] not concern the standard of proof . . . but merely one circumstance in the proof puzzle-motive." (*People v. Estep* (1996) 42 Cal.App.4th 733, 738 [49 Cal.Rptr.2d 859].) "[T]he instruction merely uses innocence as a direction signal or compass. It does not tell the jurors they must find innocence, nor does it lighten the prosecution's burden of proof, upon which the jury received full and complete instructions." (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1497 [46 Cal.Rptr.2d 645].) Thus, no reasonable juror would misconstrue CALJIC No. 2.51 as "a standard of proof instruction apart from the reasonable doubt standard set forth clearly in CALJIC No. 2.90." (*Estep,* at p. 739.) Accordingly, the instruction did not violate defend-ant's right to due process.

### i. *Erroneous Omission of CALJIC No. 17.20.1*

In counts 10 and 11—which charged defendant with the forcible rape (§ 261, subd. (2)) and attempted forcible rape (§§ 261, subd. (2), 664) of Woodruff—the information alleged that defendant inflicted great bodily injury in the commission of rape (§ 12022.8). To instruct the jury on this enhancement, the trial court gave CALJIC No. 17.20, which stated in relevant part that: " 'Great bodily injury' as used in this instruction means a

---

[11]The current version of CALJIC No. 2.51 (6th ed. 1996) now states: "Absence of motive may tend to show the defendant is not guilty."

[12]As relevant here, the trial court instructed the jury that: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt."

significant or substantial physical injury. Minor or moderate injuries of a temporary nature do not constitute great bodily injury and are not sufficient." Citing the Use Note to CALJIC No. 17.20—which calls for the use of CALJIC No. 17.20.1 "in the prosecution of forcible rape" (Use Note to CALJIC No. 17.20 (5th ed. 1988) p. 455)—defendant contends the trial court, by using CALJIC No. 17.20 instead of CALJIC No. 17.20.1, failed to inform the jury that the great bodily injury enhancement requires " 'substantial or significant injury "in addition to that which must be present in every case of rape" ' " (*People v. Escobar* (1992) 3 Cal.4th 740, 746 [12 Cal.Rptr.2d 586, 837 P.2d 1100]). According to defendant, this instructional error constitutes federal constitutional error under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] (*Apprendi*), and was not harmless beyond a reasonable doubt.

Even assuming the trial court erred and *Apprendi* controls, we find the error harmless.[13] In this case, the jury found that defendant personally used a firearm and murdered Woodruff in the commission of rape. Because death, by definition, constitutes a " 'substantial or significant injury' " apart from those injuries present in every rape (*People v. Escobar, supra,* 3 Cal.4th at p. 746), any instructional error was harmless beyond a reasonable doubt.

### j. *Erroneous Murder Instruction*

When the trial court read CALJIC No. 8.10—which defined murder—to the jury, it misread the instruction. Instead of stating that "[e]very person who unlawfully kills a human being during the commission or attempted commission of a robbery, kidnapping or rape or with malice aforethought is guilty of the crime of murder" the court mistakenly told the jury that a person is guilty of murder if he "unlawfully kills a human being during the commission or attempted commission of a robbery, kidnapping, or *rape with malice aforethought.*" Defendant contends the trial court's misreading of this instruction was prejudicial and warrants reversal of his murder conviction. Defendant is wrong. First, we recently held that the misreading of a jury instruction does not warrant reversal if the jury received the correct written instructions. (*People v. Box* (2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Although defendant urges us to reconsider, we see no reason to do so. Second, the court's misreading could only have benefited defendant because it narrowed the elements of murder. Accordingly, any error was harmless beyond a reasonable doubt. (See *Chapman v. California, supra,* 386 U.S. at p. 24 [87 S.Ct. at p. 828].)

---

[13]Defendant concedes that any instructional error was harmless with respect to count 11 because the jury acquitted defendant of attempted rape.

### k. *Erroneous Felony-murder Special-circumstance Instructions*

With respect to the felony-murder special-circumstance allega-tions, the trial court gave a separate instruction based on CALJIC No. 8.81.17 for each allegation. Each instruction was virtually identical and stated in relevant part that: "To find . . . the special circumstance . . . to be true, it must be proved: [¶] 1. The murder was committed while the defend-ant was engaged in the commission or attempted commission of [the speci-fied felony]; or [¶] 2. The murder was committed during the immediate flight after the commission or attempted commission of [the specified felony] by the defendant; *or* [¶] 3. The murder was committed in order to carry out or advance the commission of the crime of [the specified felony] or to facilitate the escape therefrom or to avoid detection." Defendant contends the instruction's use of the disjunctive "or" (italicized above) rather than the conjunctive "and" was erroneous and is reversible per se. In the alternative, defendant contends the error was not harmless because the jury could have found the special circumstances to be true without finding that defendant committed the murder in furtherance of the robberies, kidnapping, or rapes. (See *People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr.2d 1, 609 P.2d 468], overruled on other grounds by *People v. Hall* (1986) 41 Cal.3d 826, 734, fn. 3 [226 Cal.Rptr. 112, 718 P.2d 99] and *People v. Martinez* (1991) 20 Cal.4th 225, 236-237 [83 Cal.Rptr.2d 533, 973 P.2d 512] [to find true a felony-murder special circumstance, the jury must find that the defendant committed the murder "in order to advance an independent felonious pur-pose"].) Although we agree that the instruction was defective, we find the error harmless beyond a reasonable doubt.

As an initial matter, we reject defendant's contention that the error is reversible per se, even though a recent United States Supreme Court decision has partially undermined *People v. Odle* (1988) 45 Cal.3d 386 [247 Cal.Rptr. 137, 754 P.2d 184]. In *Odle*, we held that "there is no right under the Sixth or Eighth Amendments to the United States Constitution to have a jury determine the existence of all of the elements of a special circum-stance." (*Id.* at p. 411.) This holding is now erroneous after *Ring v. Arizona* (2002) 536 U.S. 584, 609 [122 S.Ct. 2428, 2443, 153 L.Ed.2d 556], which held that a jury—and not a judge—must find an "aggravating circumstance necessary for imposition of the death penalty." *Ring* did not, however, undermine the core holding of *Odle*—that an erroneous instruction that omits an element of a special circumstance is subject to harmless error analysis pursuant to *Chapman v. California, supra,* 386 U.S. 18. Because "the omis-sion of an element [of a substantive offense] is an error that is subject to harmless-error analysis" under *Chapman* (*Neder v. United States* (1999) 527 U.S. 1, 15 [119 S.Ct. 1827, 1837, 144 L.Ed.2d 35]), by analogy, the

erroneous omission of an element of a special circumstance is still subject to that same analysis, notwithstanding *Ring*.

 We therefore review this instructional error under a harmless beyond a reasonable doubt standard. In this case, "there was no evidence that reasonably or rationally suggests that" defendant committed the robberies, kidnappings, or rapes in order to carry out or advance the murder. (*People v. Williams* (1994) 30 Cal.App.4th 1758, 1763 [37 Cal.Rptr.2d 128].) Defendant and his cohorts were in the midst of robbing Rangel when the three women drove up. After seeing the women, they let Rangel go and robbed the women. They then kidnapped the women and took them away in one of the victim's cars. No evidence suggests that defendant or his cohorts intended to murder Woodruff at the time they formed the intent to rob and kidnap the women or that the robberies and kidnappings were incidental to the murder. Rather, the evidence strongly suggests that defendant committed the murder in order to advance the robberies and kidnappings or "to facilitate the escape therefrom or to avoid detection." Indeed, Sorian's promise during the kidnappings that they would not hurt the women arguably suggests that defendant and his cohorts did not have the intent to commit murder before they had the intent to commit robbery and kidnapping. Later, defendant and his cohorts took the women to an empty field where they raped them. Defendant then shot and killed Woodruff. At best, this evidence suggests that defendant developed the intent to kill Woodruff and the intent to rape her at the same time. (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150] [concurrent intent to kill and commit a felony supports a felony-murder special-circumstance finding].) Thus, the evidence shows that defendant committed the murder to advance the rape or to facilitate his escape or to avoid detection—and did not commit the rape to further the murder. Accordingly, "the failure to give CALJIC No. 8.81.17 in the conjunctive was harmless" beyond a reasonable doubt. (*Williams*, at p. 1764.)

### 1. *Erroneous Kidnapping-murder Special-circumstance Instruction*

Although the information only charged defendant with kidnapping for robbery (§ 209), the trial court instructed the jury on the lesser included offense of kidnapping (§ 207) and informed the jury that kidnapping was a general intent offense. In its instruction on the elements of the kidnapping-murder special circumstance, the court referred only to "kidnapping," and not "kidnapping for robbery." Because kidnapping is a general intent crime and because the kidnapping-murder instruction did not require the jury to find that defendant committed the murder in furtherance of the kidnapping, defendant contends the special circumstance instruction did not require the jury to find that defendant had the specific intent to commit kidnapping.

According to defendant, this error warrants reversal because the jury could have found the special circumstance to be true without finding that defendant intended to kidnap the three women. Even assuming error, it was harmless beyond a reasonable doubt. (See *ante*, at pp. 256-257 [erroneous special-circumstance instruction is subject to *Chapman*].)

The uncontroverted evidence established that defendant forced the three women at gunpoint into the backseat of a car and then drove off with them. The jury convicted defendant of kidnapping for robbery and necessarily found that defendant kidnapped the victims with the specific intent to rob them. In her closing argument, the prosecutor expressly argued that defendant had a "very specific intent to kidnap." Defendant never challenged this argument in his closing. In light of this evidence, the jury's findings, and the closing arguments, there is no possibility the jury would have found that defendant lacked the specific intent to commit the kidnappings. Accordingly, any instructional error is harmless beyond a reasonable doubt.

> m. *Erroneous Instruction Regarding Documentary Proof Introduced Under Section 969b*

■■■ At trial, the prosecution introduced a certified copy of defendant's prison records pursuant to section 969b as evidence of defendant's prior serious felony conviction. Defendant did not object to the admission of these records, but did object to the trial court's instruction that: "If you are satisfied with the records, no other evidence or testimony is necessary to prove that a person being tried for a crime has been previously convicted of a felony other than the 969b records or copies of records of any state penitentiary when such records have been certified by the official custodian of those records." Defendant contends the instruction was defective because it created a mandatory and irrebuttable presumption that defendant had a prior felony conviction. We disagree.

"As a practical matter, . . . prior convictions are normally proven by the use of documentary evidence alone." (*People v. Keating* (1981) 118 Cal.App.3d 172, 183 [173 Cal.Rptr. 286].) "Once the prosecutor presents this prima facie evidence of conviction, the trial court is allowed to make reasonable inferences from the facts presented. If there is no evidence to the contrary, the trial court may consider the abstract and the facts of the particular case, and utilizing the official duty presumption, find a defendant was convicted of and served the term of imprisonment for the listed felony." (*People v. Haney* (1994) 26 Cal.App.4th 472, 475-476 [31 Cal.Rptr.2d 547].)

In this case, the instruction given by the trial court correctly stated the law. The instruction properly informed the jury that the section 969b records

were sufficient, by themselves, to prove that defendant had been previously convicted of a felony. (See *People v. Keating, supra,* 118 Cal.App.3d at p. 183.) The instruction also expressly required the jury to be "satisfied with the records" before relying on them. Contrary to defendant's assertions, nothing in the instruction required the jury to find that defendant had a prior felony conviction. At most, the instruction permitted the jury to infer that defendant had a prior felony conviction if it was satisfied with the contents of the section 969b records. As such, it did not relieve the prosecution of its burden of persuasion (see *People v. Mendoza, supra,* 24 Cal.4th at p. 180), and we find no error.

### 4. *Prosecutorial Misconduct*

Defendant contends his convictions should be reversed because the prosecutor committed misconduct when she implied to the jury that she was precluded from presenting certain evidence in rebuttal. Like the trial court, we reject his contention.

#### a. *Facts*

After the defense rested, the prosecutor informed the court out of the presence of the jury that she intended to recall Detective Hopley. Defendant objected, and the trial court, after hearing the offer of proof, excluded the proffered testimony. The prosecutor then indicated that she had no other rebuttal witnesses. When the jury returned, the trial court informed the jury that there would be no rebuttal and asked the prosecutor, "[d]o you have any other witnesses you wish to present?" The prosecutor replied, "[o]nly Detective Hopley, your honor. I have no other witnesses." Defendant then moved for a mistrial and argued that the prosecutor's reference to Detective Hopley constituted reversible misconduct. The prosecutor responded that she was surprised by the court's question and did not intend to mislead the jury. The trial court denied defendant's motion for a mistrial and refused to cite the prosecutor for contempt.

#### b. *Discussion*

We begin by finding that defendant has waived the claim. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Although defendant made an assignment of misconduct and suggested that the trial court hold the

prosecutor in contempt, he did not request an admonition. Because an admonition would have cured any prejudice from the alleged misconduct, he cannot raise this claim on appeal. (*People v. Silva* (2001) 25 Cal.4th 345, 373 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

 Defendant's claim of prosecutorial misconduct also fails on the merits. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) " 'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' " "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 427 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Finally, "when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.)

 Here, the prosecutor's brief reference to an excluded witness in response to an unexpected question did not constitute an egregious pattern of misconduct and did not infect the trial with unfairness. (See *People v. Gionis, supra*, 9 Cal.4th at p. 1214.) Even assuming the alleged misconduct involved the use of " ' " ' "deceptive or reprehensible methods" ' " ' " (*People v. Ochoa, supra*, 19 Cal.4th at p. 427), there appears to be no reasonable likelihood that the jury applied the prosecutor's inadvertent remark "in an objectionable fashion," and nothing in the record suggests otherwise (*People v. Samayoa, supra*, 15 Cal.4th at p. 841). Accordingly, defendant's claim of prosecutorial misconduct fails.

### 5. *Ineffective Assistance of Counsel*

Defendant contends his counsel was ineffective, in violation of the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution. In support, defendant cites: (1) defense counsel's refusal to take a position on instructions for lesser included offenses and decision to rely on the trial court's sua sponte duty to give such instructions; (2) defense counsel's erroneous contention that rape was not a general intent offense and subsequent acknowledgment of his error; (3) defense counsel's withdrawal of his objection to CALJIC No. 6.20 because he could not remember the grounds for the objection; and (4) defense counsel's refusal to elaborate on his objection to CALJIC No. 8.80.1. As explained below, defendant's contention lacks merit.

■ The standards for ineffective assistance of counsel claims are well established. "We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703 [63 Cal.Rptr.2d 782, 937 P.2d 213].) To establish a meritorious claim of ineffective assistance, defendant "must establish either: (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations] or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations]." (*In re Visciotti* (1996) 14 Cal.4th 325, 351-352 [58 Cal.Rptr.2d 801, 926 P.2d 987].)

As an initial matter, we reject defendant's contention that his counsel effectively abandoned him at trial. Even a cursory review of the transcript reveals that defendant's counsel actively participated in the trial, including the colloquy over jury instructions. Counsel presented numerous witnesses, objected regularly, proffered jury instructions, and objected to the prosecution's proposed instructions. The few derelictions of duty alleged by defendant do not establish that "the prosecution's case was not subjected to meaningful adversarial testing." (*In re Visciotti, supra*, 14 Cal.4th at p. 351.)

■ In any event, none of the incidents cited by defendant support an ineffective assistance claim. For example, counsel's decision to forgo implausible arguments or objections does not constitute deficient performance. (See *People v. Ochoa, supra*, 19 Cal.4th at p. 435.) Likewise, we cannot say that counsel's refusal to take a position on lesser included offenses establishes that his performance was deficient. Given that counsel correctly recognized that the trial court had a sua sponte duty to instruct on lesser included offenses (*People v. Breverman* (1998) 19 Cal.4th 142, 153 [77 Cal.Rptr.2d 870, 960 P.2d 1094]), and given the nature of the evidence presented, counsel could have had a tactical reason for taking that position. Moreover, defendant conveniently ignores those instances where defense counsel suggested that the court instruct on certain lesser included offenses or agreed to the inclusion of such instructions proffered by the prosecution. Likewise, defendant mischaracterizes counsel's position on CALJIC No. 8.80.1. The trial court had already considered and overruled defendant's objection. Thus, counsel's decision not to elaborate further does not establish ineffective assistance. Finally, defendant does not explain how the omission or inclusion of any instructions would have altered the outcome. Accordingly, defendant can show no prejudice, and his claim of ineffective

assistance of counsel fails. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674].)

### B. *Penalty Phase Issues*

#### 1. *Instructional Errors*

##### a. *Failure to Instruct on Presumption of Innocence*

At the penalty phase, the trial court instructed the jury that it could only consider evidence of defendant's prior criminal activity if the prosecution established that defendant committed these crimes beyond a reasonable doubt. The court did not, however, instruct the jury on the presumption of innocence, and the court gave CALJIC No. 8.84.1, which instructed the jury to disregard all instructions given at the guilt phase. Defendant contends the court erred by failing to instruct the jury sua sponte on the presumption of innocence. We have rejected this contention in the past because "the special rules governing the consideration of 'other crimes' evidence in aggravation are 'statutorily based' [citation] and 'not constitutionally mandated' [citation]." (*People v. Benson* (1990) 52 Cal.3d 754, 810 [276 Cal.Rptr. 827, 802 P.2d 330].) According to defendant, however, *Ring v. Arizona, supra,* 536 U.S. 584 [122 S.Ct. 2428], undermines our previous rulings rejecting his contention. We disagree.

In *Ring*, the United States Supreme Court addressed the constitutionality of Arizona's death penalty scheme. Under Arizona law, the "first-degree murder statute 'authorizes a maximum penalty of death only in a formal sense,' [citation], for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty." (*Ring v. Arizona, supra,* 536 U.S. at p. 604 [122 S.Ct. at p. 2440].) Thus, " '[a] defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty.' " (*Id.* at p. 596 [122 S.Ct. at p. 2436], quoting *Apprendi, supra,* 530 U.S. at p. 538 [120 S.Ct. at p. 2388].) "Because Arizona's enumerated aggravating factors operate as '*the functional equivalent of an element of a greater offense*' " (*id.* at p. 609 [122 S.Ct. at p. 2443], italics added), the court held that "the Sixth Amendment requires that they be found by a jury" (*ibid.*).

The same reasoning does not, however, apply to the penalty phase determination in California.[14] ▮ "[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without the possibility of parole." (*People v. Anderson* (2001) 25 Cal.4th 543, 589-590, fn. 14 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Thus, in the penalty phase, the jury merely weighs the factors enumerated in section 190.3 and determines "whether a defendant eligible for the death penalty should in fact receive that sentence." (*Tuilaepa v. California* (1994) 512 U.S. 967, 972 [114 S.Ct. 2630, 2635, 129 L.Ed.2d 750].) No single factor therefore determines which penalty—death or life without the possibility of parole—is appropriate.

While each juror must believe that the aggravating circumstances substantially outweigh the mitigating circumstances, he or she need not agree on the existence of any one aggravating factor. This is true even though the jury must make certain factual findings in order to consider certain circumstances as aggravating factors. As such, the penalty phase determination "is inherently moral and normative, not factual . . . ." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113].) Because any finding of aggravating factors during the penalty phase does not "increase[] the penalty for a crime beyond the prescribed statutory maximum" (*Apprendi, supra,* 530 U.S. at p. 490 [120 S.Ct. at pp. 2362-2363]), *Ring* imposes no new constitutional requirements on California's penalty phase proceedings. Accordingly, our rulings rejecting the need to instruct on the presumption of innocence during the penalty phase still control. (See, e.g., *People v. Benson, supra,* 52 Cal.3d at p. 810.)

### b. *Refusal to Instruct That a Single Mitigating Factor Can Outweigh the Aggravating Factors*

▮ Defendant requested the trial court instruct the jury that: "Any mitigating circumstance presented to you may outweigh all the aggravating

---

[14]In *People v. Ochoa* (2001) 26 Cal.4th 398, 453 [110 Cal.Rptr.2d 324, 28 P.3d 78], we observed that "a finding of first degree murder with a section 190.2 special circumstance" under our death penalty scheme was "the functional equivalent of a finding of first degree murder" under Arizona's death penalty scheme, as described in *Apprendi, supra,* 530 U.S. at page 496 [120 S.Ct. at page 2366]. Because the United States Supreme Court has acknowledged that "the *Apprendi* majority's portrayal of Arizona's [capital sentencing law]" was incorrect (*Ring v. Arizona, supra,* 536 U.S. at p. 603 [122 S.Ct. at p. 2440]), we recognize that our observation in *Ochoa* was also incorrect.

factors." The trial court refused, and gave CALJIC No. 8.88.[15] Defendant now contends the court's refusal to give the requested instruction was erroneous and violated his Eighth Amendment rights. He also contends CALJIC No. 8.88 is defective because it creates a presumption of death and is incomplete and misleading. He is wrong. First, the trial court properly refused to give the requested instruction. (See *People v. Hines* (1997) 15 Cal.4th 997, 1068-1069 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Second, we have repeatedly upheld CALJIC No. 8.88 against similar challenges. (See, e.g., *People v. Ochoa, supra,* 26 Cal.4th at p. 452; *People v. Catlin* (2001) 26 Cal.4th 81, 174 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Nothing in *Ring v. Arizona, supra,* 536 U.S. 584 [122 S.Ct. 2428], casts doubt on these prior rulings, and we decline to reconsider them here.

### c. *Failure to Require Jury Finding That Unadjudicated Criminal Acts Were Violent*

In instructing the jury on the criminal acts that could be considered as aggravating circumstances under section 190.3, factor (b), the trial court gave the jury a modified version of CALJIC No. 8.87. After listing and describing the applicable criminal acts, the modified instruction stated that: "It is alleged that these acts involve the express or implied use of force or violence or the threat of force or violence." Defendant now contends the modified instruction was erroneous and warrants reversal of his judgment of death. As explained below, this contention is meritless.

As an initial matter, we reject the People's contention that defendant invited the error. "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court *when the defendant has*

---

[15]CALJIC No. 8.88 states in relevant part: "After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

made a 'conscious and deliberate tactical choice' to 'request' the instruction." (*People v. Lucero* (2000) 23 Cal.4th 692, 723 [97 Cal.Rptr.2d 871, 3 P.3d 248], italics added.) In this case, defendant first objected to the entire instruction and asked the court to eliminate it. After the court overruled this objection, defendant objected to specific aspects of the instruction. Although defendant did acknowledge that the modifications improved the instruction, he did not make a conscious and deliberate tactical choice to request the instruction. (See *id.* at pp. 723-724.) Indeed, defendant never requested the instruction in the first place. Thus, defendant did not invite the alleged instructional error.

 Although defendant's contentions are reviewable, they are not meritorious. First, we reject his contention that the modified instruction somehow implied that the jury did not have to find that the unadjudicated criminal acts involved force or violence. Although the instruction stated that the listed acts "involve the express or implied use of force or violence or the threat of force or violence," it carefully noted that this statement was an *allegation*—and not a fact. Thus, the instruction did not require the jury to find that the unadjudicated criminal acts involved force or violence. Moreover, *Ring* does not require the jury to unanimously make such a finding beyond a reasonable doubt. (See *ante*, at pp. 262-263.) Thus, the instruction did not err by failing to so require. In any event, no reasonable juror could have found that defendant committed the unadjudicated criminal acts identified in the instruction without finding that the acts involved force or violence.

Second, we reject defendant's contention that the instruction's use of the phrase "express or implied use of force or violence or the threat of force or violence" was erroneous. Although section 190.3, factor (b) uses a slightly different phraseology—"use or attempted use of force or violence or the express or implied threat to use force or violence"—we see no practical difference between the instruction's and statute's language. Indeed, the instruction's language is arguably narrower than the statute's language because it may not encompass the attempted use of force or violence. In any event, we do not see how the jury could have misconstrued this instructional language to defendant's detriment. *People v. Anzalone* (1999) 19 Cal.4th 1074 [81 Cal.Rptr.2d 315, 969 P.2d 160] is inapposite. In *Anzalone*, we merely held that an implied threat of violence did not constitute a use of "force or violence" as understood in section 2962, subdivision (e)(2)(P)—which authorized the continued confinement of prisoners with a severe mental disorder. (See *Anzalone*, at pp. 1080-1081.) We did not distinguish between the implied use of force or violence and the use or attempted use of force or violence. Accordingly, we reject defendant's challenges to this instruction.

### d. *Failure to Instruct Jury to Ignore Evidence of Other Criminal Activity Not Identified in CALJIC No. 8.87*

"In *People v. Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782] we held that section 190.3 'expressly excludes evidence of criminal activity, except for felony convictions, which activity "did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence." ' " (*People v. Pinholster* (1992) 1 Cal.4th 865, 960 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Consistent with *Boyd*, CALJIC No. 8.87 contains the following admonition: "A juror may not consider any evidence of any other criminal [act[s] [activity]] as an aggravating circumstance." (CALJIC No. 8.87 (5th ed. 1988).) The version of CALJIC No. 8.87 given by the trial court, however, omitted this admonition. Defendant contends this omission constituted prejudicial error because the jury may have improperly considered certain evidence as an aggravating circumstance. Specifically, defendant identifies his numerous verbal threats against Figueroa and his escape from a Youth Authority facility as two incidents the jury may have improperly considered in imposing death. As explained below, defendant's contention is meritless.

First, most of the threats defendant made against Figueroa constituted circumstances or continuous criminal activity properly considered in aggravation. Under section 190.3, factor (b), the jury may consider "not only the existence of" criminal activity by defendant involving the use or attempted use of force or violence "but all the pertinent circumstances surrounding it [citation], and these circumstances may be shown through testimonial evidence." (*People v. Lewis* (2001) 25 Cal.4th 610, 663 [106 Cal.Rptr.2d 629, 22 P.3d 392].) "[A]ll crimes committed during a continuous course of criminal activity which includes [the use of] force or violence may be considered in aggravation even if some portions thereof, in isolation, may be nonviolent." (*People v. Cooper* (1991) 53 Cal.3d 771, 841 [281 Cal.Rptr. 90, 809 P.2d 865].) Thus, the jury's consideration of any threats defendant made in connection with the throwing incident involving his daughter and his physical attacks on Figueroa did not violate *People v. Boyd, supra,* 38 Cal.3d 762.

Second, to the extent the erroneous instruction may have caused the jury to improperly consider threats defendant made against Figueroa and defendant's escape from a Youth Authority facility, the error was harmless. The properly admitted evidence of defendant's violent criminal acts—which included his shooting of three victims and his numerous assaults on and rapes of Figueroa—was overwhelming. In light of this evidence, we are not disturbed by any improperly considered verbal threats. Likewise, the evidence of defendant's escape was not prejudicial. The prosecution introduced

the testimony about defendant's escape to rebut defense testimony that defendant would adjust well to prison life; it did not ostensibly introduce the escape as an aggravating factor. "In light of the circumstances of the charged crimes and the volume of evidence of prior criminal activity that was properly admitted, there can be no reasonable possibility that any improperly [considered] evidence was prejudicial." (*People v. Pinholster, supra*, 1 Cal.4th at p. 963, fn. omitted.)

### e. *Erroneous Inclusion of Instructions Regarding Three Unadjudicated Criminal Offenses*

According to defendant, the trial court erred by instructing the jury that it could consider three unadjudicated crimes—child endangerment (§ 273a), witness intimidation (§ 136.1) and weapon possession while in custody (§ 4574)—as aggravating circumstances under section 190.3, factor (b). Citing *People v. Cooper, supra*, 53 Cal.3d at page 841, defendant contends these three offenses do not constitute aggravating circumstances, because they do not *inherently* involve force or violence. (See § 190.3, factor (b) [evidence of unadjudicated criminal activity is admissible as an aggravating circumstance only if it "involved the use or attempted use of force or violence or the express or implied threat to use force or violence"].) Defendant is wrong.

In *People v. Livaditis* (1992) 2 Cal.4th 759, 777 [9 Cal.Rptr.2d 72, 831 P.2d 297], we held that "Section 190.3, factor (b) . . . does not require that any specific crime *inherently* involve force or violence, only that the *actual* criminal activity be violent." Although defendant concedes that *Livaditis* rejected his contention, he contends *Livaditis* conflicts with the following sentence in *Cooper*: "Upon request by either party, the court should instruct on the elements of alleged other crimes [citation], but only those that in and of themselves involve violence within the meaning of section 190.3, factor (b)." (*People v. Cooper, supra*, 53 Cal.3d at p. 841.) Defendant, however, misreads the sentence. The sentence did not state that the unadjudicated crimes must inherently involve force or violence. Rather, the statement merely states that the actual acts must "in and of themselves involve violence." (*Ibid.*) *Cooper* is therefore consistent with *Livaditis*.

Thus, the trial court properly instructed the jury that it could consider defendant's alleged commission of child endangerment (§ 273a), witness intimidation (§ 136.1), and weapon possession (§ 4574) as aggravating circumstances. In committing child endangerment, defendant allegedly threw his daughter three to four feet. As such, the actual criminal act undoubtedly involved violence. Likewise, defendant's alleged threats to kill Figueroa if

she reported the child-throwing incident clearly involved the threat of violence. Finally, " '[i]t is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under [section 190.3,] factor (b).' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1002 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Accordingly, the trial court did not err.

 f. *Erroneous Instruction Regarding Elements of a Section 136.1 Offense*

 In instructing the jury on the specific intent element of a section 136.1 violation, the trial court stated in relevant part that: "The crime of Intimidation of a Witness requires the specific intent to prevent or dissuade another person from reporting any victimization." Defendant contends the instruction was prejudicial because it "created the misleading impression that an intent to dissuade reporting the victimization to anyone, even someone not affiliated with law enforcement, would satisfy the requirements of" section 136.1. This contention is meritless.

 As an initial matter, we reject the People's contention that defendant waived any errors in the instructions on the elements of unadjudicated crimes introduced as aggravating factors by failing to object. Although "there is no sua sponte duty at the penalty phase to instruct on the elements of 'other crimes' introduced in aggravation [citation], when such instructions are given, they should be accurate and complete." (*People v. Montiel* (1993) 5 Cal.4th 877, 942 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; see also *People v. Malone* (1988) 47 Cal.3d 1, 49 [252 Cal.Rptr. 525, 762 P.2d 1249].) The "right to correct instructions on crimes introduced in aggravation at the penalty phase stems from the right to have the penalty jury consider such crimes only if it finds them true beyond a reasonable doubt." (*Montiel*, at p. 942.) Because defendant had the right to *correct* instructions on the elements of other crimes introduced in aggravation, and because courts may review instructional errors that affect "the substantial rights of the defendant" (§ 1259), defendant did not waive these errors by failing to object. The People urge us to reconsider our holdings in *Montiel* and *Malone*, but offer no compelling reason for us to do so.

 Nonetheless, defendant's contention fails because he ignores the other instructions. In another instruction given before the specific intent instruction, the trial court informed the jury that: "Every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is a witness to a crime, from making any report of such victimization to *any law enforcement officer or prosecuting agency or to any judge* is guilty of the crime of violation of Penal Code section 136.1,

intimidation of a witness." Read together, the two instructions are not misleading and clearly state that a violation of section 136.1 occurs only if a defendant prevents or dissuades a witness from reporting a crime to the authorities.[16] Thus, the instructions were proper.

g. *Failure to Instruct on Knowledge Requirement for a Section 4574 Violation*

██ As an aggravating factor, the prosecution alleged that defendant possessed deadly weapons—two shanks—while in jail, in violation of section 4574, subdivision (a). The trial court instructed the jury that: "Every person who, while lawfully confined in jail[,] possesses any deadly weapon is guilty of the crime of violation of Penal Code section 4574." The remainder of the instruction defined "deadly weapon" and "actual" and "constructive possession." Defendant contends the instruction was deficient because it did not require the jury to find that he "knew of" the weapon's "presence and nature as a [deadly weapon]." (CALJIC No. 7.34.02; cf. *People v. Rubalcava* (2000) 23 Cal.4th 322, 332 [96 Cal.Rptr.2d 735, 1 P.3d 52] [holding that a defendant is guilty of carrying a concealed dirk or dagger only if he knows "he is carrying the weapon" and "the concealed instrument may be used as a stabbing weapon"].)

Even assuming the instruction was deficient, the error was harmless.[17] The shanks were six to seven inches long and had sharpened ends and cloth handles. The shanks were hidden under defendant's bunk in a cell accessible only to defendant and "sworn personnel." Defendant admitted that he possessed the shanks for protection. Defendant presented no evidence suggesting that he did not know of the shanks' presence in his cell and their nature as deadly weapons. Given the overwhelming evidence of defendant's knowledge, the error was harmless beyond a reasonable doubt. (See *People v. Malone, supra*, 47 Cal.3d at pp. 49-50.)

h. *Failure to Instruct on the Meaning of Life Without Possibility of Parole*

The trial court instructed the jury with CALJIC No. 8.84, which states in relevant part that: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in

---

[16]Contrary to defendant's assertion, the trial court's failure to qualify the phrase "law enforcement officer" with the phrase "state or local" did not render the court's instruction defective. Section 136.1, subdivision (b)(1) makes it a crime to dissuade a witness from "[m]aking any report . . . to *any peace officer or state or local law enforcement officer . . . .*"

[17]For the reasons stated above (see *ante,* at pp. 267-268), we reject the People's contention that defendant waived this instructional error.

the state prison for life without possibility of parole in any case in which the special circumstances alleged in this case have been specially found to be true. [¶] Under the law of this state, you must now determine which of said penalties shall be imposed on the defendant." Citing *Simmons v. South Carolina* (1994) 512 U.S. 154 [114 S.Ct. 2187, 129 L.Ed.2d 133] (plur. opn. of Blackmun, J.) (*Simmons*), defendant contends CALJIC No. 8.84 does not adequately inform the jury that "life without possibility of parole" means confinement for life without the possibility of parole. (See also *Kelly v. South Carolina* (2002) 534 U.S. 246, 248 [122 S.Ct. 726, 728, 151 L.Ed.2d 670] ["when 'a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant "to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel" ' "]; *Ramdass v. Angelone* (2000) 530 U.S. 156, 165 [120 S.Ct. 2113, 2119-2120, 147 L.Ed.2d 125] (plur. opn. of Kennedy, J.) [same].) Since *Simmons*, we have, however, held that CALJIC No. 8.84 adequately informs the jury "of the defendant's ineligibility for parole." (*People v. Smithey, supra*, 20 Cal.4th at p. 1009.)

Although defendant acknowledges our post-*Simmons* decisions upholding CALJIC No. 8.84, he contends *Shafer v. South Carolina* (2001) 532 U.S. 36 [121 S.Ct. 1263, 149 L.Ed.2d 178], casts doubt over these decisions. Contrary to defendant's contention, *Shafer* is distinguishable. In *Shafer*, the United States Supreme Court concluded that the instruction that " 'life imprisonment means until the death of the defendant' " did not satisfy *Simmons* because the instruction did not clearly eliminate the possibility of parole and because many jurors may not know " 'whether a life sentence carries with it the possibility of parole.' " (*Shafer*, at p. 52 [121 S.Ct. at p. 1273].) The court also found the instruction ambiguous because the judge also instructed the jury that " '[p]arole eligibility or ineligibility is not for your consideration.' " (*Id.* at p. 53 [121 S.Ct. at p. 1274].) The latter instruction "did nothing to ensure that the jury was not misled and may well have been taken to mean 'that parole *was* available but that the jury, for some unstated reason, should be blind to this fact.' " (*Ibid.*, quoting *Simmons, supra*, 512 U.S. at p. 170 [114 S.Ct. at p. 2197] (plur. opn. of Blackmun, J.).)

By contrast, CALJIC No. 8.84 does not suffer from the same deficiencies. Unlike the jury in *Shafer*, "the jury [in this case] expressly [was] informed of the defendant's ineligibility for parole by the instruction that it must choose between death or 'confinement in the state prison for life without the possibility of parole.' " (*People v. Smithey, supra*, 20 Cal.4th at p. 1009.) The term " 'life without the possibility of parole' " is clear and unambiguous and does not require "a sua sponte definitional instruction."

(*Ibid.*) Moreover, none of the other penalty phase instructions given by the trial court suggested that defendant would somehow be eligible for parole if the jury did not sentence him to death. Accordingly, *Shafer* is inapposite, and defendant's contention fails.

### i. *Refusal to Give Mercy Instruction*

Defendant asked the trial court to instruct the jury that "[i]n determining whether to sentence the defendant to life imprisonment without possibility of parole, or to death, you may decide to exercise mercy on behalf of the defendant." The trial court refused, and defendant contends its refusal violates the Eighth Amendment of the United States Constitution and warrants the reversal of his judgment of death. We have, however, rejected this contention in the past (see, e.g., *People v. Lewis* (2001) 26 Cal.4th 334, 393 [110 Cal.Rptr.2d 272, 28 P.3d 34]), and defendant offers nothing to compel our reconsideration of these prior rulings. In any event, the rejected instruction was cumulative.[18] (See *Lewis*, at p. 393 [holding that CALJIC No. 8.85 adequately covers the mercy instruction].) Accordingly, defendant's contention is meritless.

### j. *Failure to Give Presumption of Life Instruction*

Defendant contends the trial court erred by failing to instruct the jury on the presumption of life. As defendant acknowledges, we rejected this contention in *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]. We have affirmed that holding on several other occasions. (See, e.g., *People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531].) Defendant offers no compelling reason for us to reconsider. Accordingly, we decline to do so.

### k. *Failure to Distinguish Between Aggravating and Mitigating Factors*

In listing all the factors relevant to the penalty phase determination, the trial court did not distinguish between the aggravating and mitigating factors. As defendant acknowledges, we have previously held that courts need not do so. (See, e.g., *People v. Cox* (1991) 53 Cal.3d 618, 673 [280 Cal.Rptr.

---

[18]CALJIC No. 8.85, as given to the jury, states: "You may consider sympathy or pity for a defendant, if you feel it appropriate to do so, in determining whether to impose the death penalty or life in prison without the possibility of parole. [¶] If any of the evidence arouses sympathy, or compassion in you to such an extent as to persuade you that death is not the appropriate punishment, you may act in response to these feelings of sympathy and compassion and impose life in prison without the possibility of parole."

692, 809 P.2d 351].) Defendant, however, contends our previous holdings are erroneous, because *Ring v. Arizona, supra,* 536 U.S. 584 [122 S.Ct. 2428], now requires the jury to find each aggravating factor—but not each mitigating factor—beyond a reasonable doubt. (See also *Apprendi, supra,* 530 U.S. at pp. 490-491, fn. 16 [120 S.Ct. at p. 2363] [noting "the distinction the Court has often recognized [citation] between facts in aggravation of punishment and facts in mitigation"].) We disagree. As explained earlier, *Ring* does not apply to California's penalty phase proceedings. (See *ante,* at pp. 262-263.) Accordingly, the trial court had no constitutional duty to distinguish between the aggravating and mitigating factors.

### 2. *Failure to Question Jurors Regarding Newspaper Article*

■ Defendant contends the trial court's refusal to question jurors regarding a newspaper article containing statements made by the prosecution in violation of a gag order constitutes reversible error. We disagree.

#### a. *Facts*

The day after Quinones testified about the gun incident involving defendant, a newspaper published an article stating that a witness had received threats but that "[n]o details about the threats were available." The article further stated that the witness's name "was [being] withheld at the request of the District Attorney's Office." Defendant promptly called the article to the trial court's attention and claimed that the prosecutor had violated the gag order and committed misconduct. Defendant then asked the court to question jurors individually regarding whether they had read the article, moved for a mistrial, and suggested that the court consider sanctions. The prosecutor admitted that her investigator had spoken to the reporter but claimed that he only did so because Quinones had requested that her name be omitted from any newspaper articles. The prosecutor also denied any intention to get this information published. Although the court admonished counsel, it denied the motion for a mistrial and declined to question the jurors about the article.

#### b. *Discussion*

Although a juror who "read[s] newspaper articles about the case he or she is deciding" commits "misconduct, raising a presumption of prejudice [citation] and triggering a duty of the trial court to make appropriate inquiry," nothing in the record, aside from defense counsel's speculation, suggests that any juror did so. (*People v. Marshall* (1996) 13 Cal.4th 799, 864 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) Throughout the trial, the court admonished the jurors to avoid reading articles about the case. "[I]n the absence of

evidence to the contrary we must presume they followed the court's admonition." (*Ibid.*) Although the prudent course may have been to question the jurors (see *People v. Adcox* (1988) 47 Cal.3d 207, 253 [253 Cal.Rptr. 55, 763 P.2d 906]), we will not "presume prejudice" absent a threshold showing that some jurors had, in fact, seen the newspaper article (*Marshall*, at p. 864). Because there was no such showing, the court "was put on no duty of inquiry." (*Ibid.*) Accordingly, the court did not err by refusing to question the jurors.

### 3. *Failure to Conduct Timely Hearing on Juror Misconduct*

Defendant contends the trial court committed prejudicial error by failing to investigate allegations of juror misconduct in a timely manner. This contention lacks merit.

### a. *Facts*

After the jury had reached a verdict, but before the trial court had announced it, defendant advised the court that he had just learned about some improper communications between jurors and a spectator at the trial, Laura Simmons. After defendant requested additional time to investigate further, the court recessed the matter to the afternoon. In the afternoon, defendant indicated that Simmons was available to testify and asked the court to conduct an evidentiary hearing before announcing the verdict. The court refused to conduct a hearing at that time but told defendant he could "bring" the juror misconduct issue "to the court in a proper fashion." The court then announced the verdict and discharged the jury.

At the hearing on the motion to modify the verdict pursuant to section 190.4, defendant submitted a request for posttrial discovery regarding the jurors. The court denied the request because defendant presented no supporting documents and did not provide adequate notice of the request to the prosecution. A few days later, the prosecution moved to preclude defendant from contacting jurors without a court order because several jurors were upset that defendant had access to their addresses. The court denied the motion, but strongly recommended that defendant avoid contacting jurors who had expressed "a desire they not be contacted."

Almost three months after the verdict, defendant filed a motion for new trial based on juror misconduct. In support, defendant submitted a declaration from Simmons averring that: (1) a juror told her about the juror's expectation that witnesses present at the abduction would testify after the prosecution rested; (2) a juror asked her who the spectators at trial were; and

(3) a juror asked her opinion on the verdicts. Defendant also claimed that the prosecution had improperly dissuaded jurors from speaking to the defense. In opposition, the prosecution submitted declarations from 11 of the 12 jurors denying that they had talked to Simmons or any other spectator about the trial. An alternate juror also declared that she had spoken briefly to Simmons. During the conversation, she had mentioned two spectators and said, as an afterthought, "I wonder who they are?" Simmons then told her that she could not tell her. The prosecution also submitted declarations averring that it had never dissuaded any juror from contacting the defense and that it had only informed jurors they were not obligated to speak to the prosecution. After a hearing, the trial court found that the declarations failed to establish any improper contact between jurors and spectators or any prejudice to defendant and denied the motion.

### b. *Discussion*

As an initial matter, we note that defendant does not contend the trial court abused its discretion by denying his motion for a new trial. Indeed, the evidence in the record amply supports the court's conclusion that the jurors had no improper contacts with nonjurors. Thus, the court did not commit a "manifest and unmistakable abuse of " its discretion in refusing to grant the motion. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1260-1261 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

Instead of challenging the denial of his motion, defendant contends the court abused its discretion by failing to investigate the alleged juror misconduct before announcing the verdict and discharging the jury. According to defendant, the court's failure to conduct a timely investigation precluded him from obtaining access to the jurors. As explained below, we disagree.

"When a trial court is aware of *possible* juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter." (*People v. Hayes, supra,* 21 Cal.4th at p. 1255.) Although courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" (*People v. Keenan* (1988) 46 Cal.3d 478, 532 [250 Cal.Rptr. 550, 758 P.2d 1081]), they have considerable discretion in determining how to conduct the investigation. "The court's discretion in deciding whether to discharge a juror encompasses the discretion to decide what specific procedures to employ including whether to conduct a hearing or detailed inquiry." (*People v. Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].)

In this case, the court acted well within its discretion in delaying its inquiry until after the announcement of the verdict. When defendant

alerted the court to the alleged misconduct, the court was just about to receive the verdict from the jury. At that time, defendant had not fully investigated the matter and could only provide the court with vague and unsubstantiated allegations. In light of these vague, last-minute allegations, the court could properly have declined to investigate the allegations at that time and could have received the verdict immediately. (See *People v. Beeler*, *supra*, 9 Cal.4th at p. 989.) The court's decision to do so a few hours later, even though a witness was available to testify as to the misconduct, did not transform its refusal to delay the verdict into an abuse of discretion.

In any event, defendant can show no prejudice. Presumably, defendant presented all the evidence he would have presented at a preverdict hearing in support of his motion. The court considered this evidence and properly rejected defendant's claim of juror misconduct, and defendant presents nothing to suggest that the court would have found juror misconduct if it had conducted the hearing before receiving the verdict. Although defendant contends the prosecution prevented him from speaking to jurors after the verdict, nothing in the record supports his claim. Indeed, the prosecution submitted declarations denying any effort to limit defendant's contact with jurors, and the court expressly refused to limit defendant's ability to do so. Defendant's claim that he could have obtained more evidence of juror misconduct if the court had conducted a hearing before taking the verdict is wholly speculative. Accordingly, we find no reversible error.

### 4. Challenges to California's Death Penalty Law in Light of Ring

Defendant contends we must reconsider many of our rulings upholding the constitutionality of California's death penalty law in light of *Ring v. Arizona*, *supra*, 536 U.S. 584 [122 S.Ct. 2428]. According to defendant, *Ring* undermines our previous rulings that: (1) the jury need not find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt; (2) the jury need not find each aggravating factor beyond a reasonable doubt; (3) juror unanimity on the aggravating factors is not necessary; and (4) written findings are not required. (See, e.g., *People v. Ochoa*, *supra*, 26 Cal.4th at p. 462.) As explained earlier, the penalty phase determination in California is normative, not factual. It is therefore analogous to a sentencing court's traditionally discretionary decision to impose one prison sentence rather than another. (See *ante*, at pp. 262-263.) Accordingly, *Ring* does not undermine our previous rulings upholding the constitutionality of California's death penalty law, and we reaffirm our rejection of defendant's contentions. (See *ibid.*)

### 5. Other Challenges to California's Death Penalty Law

Defendant contends California's death penalty law is unconstitutional on numerous grounds. We have, however, rejected these grounds in the past.

For example, we have held that the death penalty law adequately narrows the class of death-eligible offenders. (*People v. Burgener* (2003) 29 Cal.4th 833, 884, 884, fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1].) We have also held that: (1) the trial court need not instruct "that the absence of mitigating factors is not itself aggravating" (*People v. Coddington* (2000) 23 Cal.4th 529, 639 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]); (2) the absence of intercase proportionality review does not make the imposition of death sentences arbitrary or discriminatory or violate the equal protection and due process clauses (*People v. Lewis, supra,* 26 Cal.4th at pp. 394-395); (3) the consideration of defendant's unadjudicated criminal activity in the penalty phase is permissible (*ibid.*); and (4) the use of certain adjectives—i.e., " 'extreme' " and " 'substantial' "—in the list of mitigating factors does not render the statute unconstitutional (*ibid.*). Finally, we have held that section 190.3, factor (a)—which permits consideration of the "circumstances of the crime" as an aggravating factor—is not impermissibly vague and "provides adequate guidance to a jury in sentencing." (*Lewis,* at p. 394.) Accordingly, these contentions fail.

### C. *Other Issues*

#### 1. *Prior Serious Felony Enhancement on Count 15.*

In count 15, the information charged defendant with possession of a firearm by a felon in violation of section 12021, subdivision (a). The information further alleged that, as to count 15, defendant was convicted of a serious felony in violation of section 245, subdivision (a)(2), within the meaning of section 667, subdivision (a). The jury found defendant guilty on count 15 and found true the prior serious felony conviction. At sentencing, the trial court imposed a five-year term for the prior serious felony enhancement on count 15. Defendant contends, and the People concede, that the imposition of the enhancement as to count 15 was improper because a violation of section 12021, subdivision (a) is not a serious felony as defined in section 1192.7, subdivision (c), and is therefore not subject to section 667, subdivision (a). We agree and strike the serious felony enhancement as to count 15.

#### 2. *Life Without Possibility of Parole Sentence on Counts 5, 6 and 7*

The jury found defendant guilty of violating section 209, subdivision (b) in counts 5, 6 and 7. Because the maximum sentence for that offense is life with the possibility of parole (see § 209, subd. (b)), defendant contends the abstract of judgment erroneously imposed a sentence of life *without* the

possibility of parole as to those counts. The People concede the error and note that the trial court only intended to impose "the penalty of life" or "the term of life" on these counts. Accordingly, we order that the abstract of judgment be amended to reflect a sentence of life with the possibility of parole as to counts 5, 6, and 7.

### 3. *Erroneous Denial of Motion for Reduction of Penalty*

■ Defendant contends the trial court, in ruling on his automatic motion to modify the verdict (§ 190.4, subd. (e)), improperly considered certain factors in aggravation. Contrary to defendant's contention, the court did not have to " 'employ the same type of analysis the jury would have done [*sic*] under the instructions.' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 245 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Thus, the court's consideration of defendant's willful possession of "jail-made weapons while he was in custody" was proper under section 190.3, factor (b). Likewise, the court's reliance on the random selection of the victims and evidence indicating defendant's intent "that all of the victims should die" was proper under section 190.3, factor (a). (See *People v. Catlin, supra,* 26 Cal.4th at p. 177.) Finally, the court's comprehensive statement of the reasons for its ruling demonstrates that the court fulfilled its statutory duty by "independently [reweighing] the evidence of aggravating and mitigating circumstances and . . . determin[ing] whether, in its independent judgment, the weight of the evidence support[ed] the jury's verdict." (*People v. Crittenden* (1994) 9 Cal.4th 83, 150 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

### III. DISPOSITION

We strike the serious felony enhancement as to count 15 and order the abstract of judgment be amended to reflect a sentence of life with the possibility of parole as to counts 5, 6, and 7. We affirm the judgment in all other respects.