Filed 12/23/22  P. v. Williams CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094467 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE007516) |
| v. | |
| RONALD WILLIAMS, | |
| Defendant and Appellant. | |

A jury found defendant Ronald Williams guilty of two counts of committing a lewd and lascivious act on K.D., a child under 14, and the trial court sentenced him to 21 years in state prison.  Defendant contends the trial court erred by admitting evidence of prior uncharged sexual offenses against three minors under Evidence Code section 1108,[1] and in excluding proffered defense evidence that he claimed undermined the

_____

[1] Further undesignated statutory references are to the Evidence Code.

1

credibility of K.D. and the investigating detective, namely: that K.D. had also accused her cousin of sexually assaulting her, which the cousin denied, and that law enforcement's investigation of the cousin, who had never been charged, was inadequate. He claims the errors were individually and cumulatively prejudicial, violating his federal and state constitutional rights to due process and a fair trial.

Finding no merit to his contentions, we affirm.

## FACTS AND PROCEEDINGS

### A. Charges

Defendant was charged with committing two counts of lewd and lascivious acts against his minor niece, K.D. (Pen. Code, § 288, subd. (a); count one [licking area near her ear] & count two [hand to thigh]), who was between the ages of 8 and 10 at the time. It was further alleged that defendant had a prior strike (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), and a prior serious felony conviction (Pen. Code, § 667, subd. (a)).

### B. Motions in Limine

Prior to trial, the prosecutor moved in limine to introduce five prior instances of sexual misconduct under section 1108. These included: (1) a 1977 sexual assault of eight-year-old Kimberly B. who alleged that defendant attacked her and tried to force her to orally copulate him (defendant was acquitted of the charges); (2) a 1982 rape and sodomy of the mother of defendant's former girlfriend for which defendant was convicted of first degree burglary and rape by force or fear and sentenced to 13 years in state prison; (3) a 1995 incident with 12-year-old Melissa C., who reported that defendant had repeatedly tried to entice her to have sex, asked to see her vagina and open her legs, and masturbated in front of her; (4) a 1995 incident with 10-year-old Briana M. who reported that defendant masturbated in front of her and also asked her to open her legs; and (5) prior incidents involving defendant's minor niece, Paige A., who alleged defendant made inappropriate sexual comments to her, put his hand on her thigh and

2

moaned, tried to get her to sit on his lap, and walked around the house in his underwear with his penis visible.

Defendant moved to exclude the section 1108 evidence, arguing it was irrelevant and that its probative value did not outweigh its prejudice.

In ruling on the competing motions, the court set forth the applicable standards under section 1108 and section 352, and, after weighing the relevant factors, admitted three of the five prior incidents under section 1108--those involving Melissa, Briana, and Paige. The court found the 1977 Kimberly B. acquittal and the 1982 rape conviction inadmissible as more prejudicial than probative under section 352.

The parties also filed respective motions in limine regarding the admissibility of evidence that K.D. claimed another family member had sexually abused her. Defendant sought to introduce evidence that when making her allegations against defendant, K.D. also had accused a teenage cousin of forcing her to orally copulate him multiple times around the same time period, and that because she was inconsistent as to when that alleged misconduct happened, and the cousin subsequently denied the accusations, that K.D.'s allegations against the cousin were false, which would undermine her credibility at trial. Defendant also sought to admit evidence to show law enforcement did not adequately investigate the cousin because the cousin had never been charged, and the detective failed to locate the cousin during his investigation even though the defense easily contacted him after the fact. The People moved to exclude any reference to the fact that K.D. also claimed to have been sexually abused by her cousin.

The court ruled that, under section 1103, evidence that K.D. previously had falsely accused someone of sexually assaulting her could be relevant to impeach her credibility. However, after considering the probative value of the proffered evidence against its prejudicial effect under section 352, including the undue consumption of time needed to prove whether K.D.'s allegations against her cousin were *actually* false and potential

3

confusion of the issues, the court ruled both lines of evidence inadmissible as more prejudicial than probative.

*C.     Trial*

At trial, 16-year-old K.D.[2] testified that defendant was her great-uncle.  When she was younger, K.D. lived at her great-aunt Bonnie W.'s house with Bonnie, K.D.'s mother Gloria W., and K.D.'s great-grandmother.  K.D. and her mother shared an upstairs bedroom in the two-story home.  At some point between 2012 and 2015, when K.D. was between 8 and 10 years old, defendant, whom K.D. referred to as "Uncle Ronnie," also moved into Bonnie's house.[3]

Sometimes when K.D. was alone with defendant at the house, he would try to get her to sit on his lap, and he would show her pictures of women in lingerie on his phone. K.D. did not disclose defendant's conduct even though it made her uncomfortable.

While she was uncertain as to precise dates, K.D. testified that one night sometime between 2012 and 2015, K.D. stayed home with her great-grandmother and defendant while her mother and Bonnie left to play bingo.  K.D. was alone in her bedroom, lying on her side on the bed watching television.  She was wearing a tank top, underwear, and pajama pants.

Defendant came into K.D.'s room and lay down behind her on the bed, "spooning" her with his body, and wrapping his arm around her waist.  Defendant did not say anything to her, but licked her right ear and rubbed his hand on the inside of her thigh towards her vagina.  K.D. froze with fear.

Defendant tried to pull K.D.'s pants down.  K.D. cried and told defendant to stop as she tried to pull her pants back up.  Defendant pulled K.D.'s pants around her knees as

---

[2]  K.D. was born in 2004.

[3]  Defendant is the brother of great-aunt Bonnie and Gloria's father.

4

she kicked him and repeatedly told him to stop. As defendant tried to pull her pants all the way down while she struggled to keep them up, defendant angrily told K.D. to "stop kicking." At that point, K.D. thought defendant was going to rape her. K.D. continued to resist, and, after landing one of her kicks on defendant, he gave up and left the room. K.D. immediately locked her bedroom door.

K.D. cried herself to sleep. She did not tell her mother what defendant had done when her mother returned from playing bingo. She was afraid to tell her mother because she thought her mother would not believe her.

About a year later, K.D. told her cousin Paige, who was about three years older than K.D., what defendant had done that night. Paige encouraged K.D. to tell her mother. That same day, K.D. told her mother what happened with defendant, but she thought her mother might not have believed her. K.D. did not believe her mother ever contacted law enforcement after her disclosure.

Several years later, in July 2019, 14-year-old K.D. was with her aunt Jackie (on her father's side) and got in trouble for having inappropriate anime photos on her cell phone. In an attempt to get out of trouble, K.D. disclosed to Jackie what defendant had done to her years earlier. Jackie told K.D.'s mother that K.D. should report defendant to law enforcement, and K.D.'s mother called police.

K.D. spoke with law enforcement at her apartment in July 2019. Although she testified that she told the responding officers the truth about what happened with defendant, she acknowledged that she did not tell the officers that defendant had lain behind her or spooned her. She also admitted that she had told the officers that defendant never touched her when he tried to pull her pants down.

About a week later, Sacramento Police Department Detective Terrence Mercadal interviewed K.D. at the police station. She told him that defendant's behavior towards her when she was 8 to 10 years old was sexual in nature. She also said that sometimes her cousin S.H., who was about the same age as K.D., was around when defendant

5

showed her inappropriate photos on his phone, although K.D. never said that defendant also showed the pictures to S.H. or otherwise discussed the pictures with her.

During cross-examination, K.D. conceded that she told the responding officers that defendant had shown her naked pictures of women, but later told Detective Mercadal that the women were in lingerie. K.D. explained that she remembered more details by the time Detective Mercadal interviewed her. K.D. also conceded that she told law enforcement that her cousin Paige was known to be a liar when she was younger, but said that she was simply repeating something her mother told her and that her statement was not based on any personal experience with Paige. K.D. was unsure whether defendant moved out of great-aunt Bonnie's house first, or whether she and her mother moved out before him.

Paige, who was 19 years old at trial, testified that when she was approximately 11 or 12 years old, she would visit Bonnie's house where her cousin K.D. and defendant both lived at the time. One day, K.D. disclosed to Paige that defendant had done something inappropriate to her. K.D. said that defendant had touched her, but she would not tell Paige any details of what happened, and she did not want Paige to tell anyone. A short time later, Paige told K.D.'s mother. K.D.'s mother cried and seemed to take her seriously.

Afterwards, Paige felt awkward at Bonnie's house and stopped visiting. Paige moved out of state about a year later, and did not keep in contact with K.D. or that side of her family, including defendant. In 2019, K.D.'s mother called Paige to alert her that a detective might contact her to discuss the incident between defendant and K.D.

Paige told Detective Mercadal that she herself felt uneasy around defendant when she used to visit Bonnie's house. According to Paige, defendant would sit next to her when no other adults were around and put his hand on her upper thigh and moan, causing her to get up and move away from him. She saw defendant try to get K.D. to sit on his lap as well, and while it made Paige uncomfortable, she was unsure at the time how K.D.

6

felt about his attempts. However, Paige felt like K.D. always wanted her to be around whenever defendant was present and K.D. did not want Paige to leave her alone with defendant. She got the impression that K.D. was trying to avoid defendant.

Several times, defendant slowly walked around the house in his underwear with the outline of his penis visible, and, on four or five occasions, he tried to get Paige to sit on his lap when he was outside in front of the house. One time, when Paige was in the kitchen eating noodles that were hot, defendant told her: "Blow on it . . . blowing on stuff will get you further in life." She did not tell anyone about defendant's conduct towards her even though it made her very uncomfortable because she did not like to discuss it.

On cross-examination, Paige conceded that she had told Detective Mercadal that she had never witnessed any inappropriate behavior between defendant and K.D. She also acknowledged that she never told her mother any of the details regarding defendant's behavior that made her uncomfortable.

K.D.'s mother, Gloria, testified that she and K.D. moved in with her aunt Bonnie when K.D. was in second grade, and they lived there for about four years. Defendant moved into the house while they lived there.

According to Gloria, K.D. told her something happened with defendant one night when Gloria returned home from playing bingo, although she did not specify details of what happened. Gloria later admitted that she was unsure when exactly K.D. told her something inappropriate had happened. While Gloria believed her daughter, she was young and scared and did not know what to do. Gloria did not call the police, but thereafter stayed home with K.D. to ensure her safety.

Gloria testified that in July 2019, after K.D. got in trouble with her aunt Jackie for having inappropriate images on her phone, K.D. disclosed to Jackie what defendant had previously done to her several years earlier, and Jackie made K.D. tell Gloria. Gloria then called the police.

7

Gloria told Detective Mercadal that she was not sure she could believe K.D. because K.D. had been around Paige, who was "always lying all the time." Gloria did not remember if she ever told law enforcement that Paige told her that defendant had acted inappropriately with both Paige and K.D. She also conceded that she did not tell the detective that defendant had ever licked K.D.'s ear or touched her thigh.

Detective Mercadal, who worked in the Sex Assault and Child Abuse Unit, testified that he interviewed K.D. in July 2019, when she was 14 years old, about the incident with defendant that occurred approximately four to seven years earlier. K.D. reported that when she was between 8 and 10 years old, defendant had shown her pictures of women in lingerie two or three times. Sometimes her cousin S.H. was home, although K.D. did not say that defendant also showed S.H. the pictures. K.D. explained that one night defendant pulled her pajama pants down in her bedroom and rubbed her thigh towards her groin area. He also licked her ear.

Detective Mercadal also interviewed Paige. She told him that defendant walked around Bonnie's house about five times with his penis "hanging out," contrary to her trial testimony that the outline of his penis could be seen through his underwear. Paige also reported that K.D. was sometimes at home during these episodes, although she did not say K.D. ever saw defendant in his underwear and K.D. herself never mentioned this conduct to Detective Mercadal.

Briana M. testified that in July 1995, when she was about 10 or 11 years old, she lived in the same apartment complex as defendant. One day, she sat outside her apartment alone and chatted with defendant, who lived in the apartment next door. Defendant was seated on the ground in his doorway, and she could see his hand moving inside his pants. Defendant asked her a question that she could not hear so she moved closer to him. As she got closer, she saw that defendant appeared to be masturbating. Defendant then asked her to open her legs so he could look at her. She started crying and

8

quickly went back inside her apartment. Briana told her parents what happened, and reported it to police a few days later.

Melissa C. testified that in June or July 1995, when she was 12 years old, she lived in the same apartment complex as defendant and Briana. Her apartment was a few doors down from Briana's apartment as well as defendant's apartment. She recalled that one time she walked past defendant's window and saw him masturbating through the open blinds. On the evening of July 3, Melissa was downstairs in a friend's apartment when defendant stopped by and said he wanted to meet her upstairs, intimating he wanted to have sex with her, and that she was "not gonna back out." He told her he would "make love" to her. Defendant's comments made her feel uncomfortable and scared.

The following day, July 4, while in another friend's apartment, defendant walked in and sat next to her on the couch. He began touching her upper thigh several times and speaking quietly to her. He told her that she had nice, muscular thighs, and he tried to get her to go upstairs with him. Defendant got up and left the apartment, but Melissa did not follow. He returned a few minutes later, angry and irritated that she had not gone upstairs, and he again tried to coax her upstairs with him. Later that night, Melissa encountered defendant near the open door of his apartment where he told her to "[o]pen your legs," and "[s]how me your pussy" while he masturbated in front of her. The incident was reported to police.

Defendant did not testify, but he called two witnesses on his behalf: his niece, Elizabeth N., and her daughter S.H. Elizabeth was Gloria's cousin, and Bonnie was Elizabeth's mother.

Between 2015 and 2016, Elizabeth and S.H. lived at Bonnie's house for about eight or nine months. After defendant was arrested in May 2020, Elizabeth learned from Bonnie that sometime before she and S.H. moved in, K.D. alleged that defendant had engaged in inappropriate sexual behavior with her. Elizabeth never saw K.D. trying to distance herself from defendant. She also did not observe Gloria staying home with K.D.

9

as if she was trying to protect her; rather, she would leave K.D. at home when defendant was present.

Elizabeth, who was 34 years old, testified that she had known defendant her whole life, and she did not believe it was in defendant's character to engage in lewd conduct with children. She had no concerns about her daughter interacting with defendant. However, during cross-examination, she acknowledged that she was unaware of the sexual allegations against defendant involving Briana, Melissa, and Paige.

S.H. testified that she used to be close with her cousin K.D. when they were both about 10 years old. S.H. did not notice any strange behaviors between K.D. and defendant, nor did she observe K.D. trying to distance herself from defendant. K.D. never told S.H. that defendant was inappropriate with her, and defendant was never inappropriate with S.H. On cross-examination, S.H. acknowledged that she was not present on the night K.D. alleged defendant accosted her in her bedroom and had no personal knowledge of the incident. She also conceded that K.D. was not around defendant that much.

Following the close of evidence, the jury found defendant guilty as charged. Defendant waived a jury trial on the prior conviction allegations, and in a subsequent proceeding, the court found the prior serious felony and prior strike allegations true beyond a reasonable doubt.

The court denied defendant's *Romero*[4] motion to strike the strike prior, and sentenced defendant to an aggregate term of 21 years in state prison. The court imposed the upper term of eight years on count one, doubled to 16 years for the strike prior conviction (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), a concurrent 16-year term for

---

[4] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

count two (the upper term of eight years doubled for the strike prior), plus five years for the prior serious felony enhancement (§ 667, subd. (a)). Defendant timely appealed.

**DISCUSSION**

**I**

*Admission of Uncharged Sexual Offenses Under Section 1108*

Defendant contends the trial court abused its discretion by admitting evidence of uncharged sex offenses against Briana, Melissa, and Paige under section 1108 to prove he had a propensity to commit the charged sexual offenses against K.D. His argument is twofold. He first contends section 1108 is unconstitutional. He next argues that even if the statute is constitutional, the court erred in finding the prior uncharged sexual offenses more probative than prejudicial under section 352. We reject both contentions.

*A.      Section 1108*

Character or disposition evidence is generally inadmissible under section 1101, subdivision (a) to prove a defendant's conduct on a specified occasion. (*People v. Leon* (2015) 61 Cal.4th 569, 597; § 1101, subd. (a).) Section 1108 creates an exception to the general rule in section 1101 that character evidence is not admissible to prove propensity. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*) ["the Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases"].)

"Subdivision (a) of [section 1108] provides in pertinent part that 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352 [permitting court to exclude evidence on weighing probative value and prejudicial impact].' " (*Falsetta, supra*, 21 Cal.4th at p. 911.) In enacting section 1108 the Legislature recognized the " 'serious and secretive nature of sex crimes and the often[-]resulting credibility contest at trial,' " and intended in sex offense cases to relax the evidentiary restraints imposed by

11

section 1101 "to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*Falsetta,* at p. 911; see also *People v. Escudero* (2010) 183 Cal.App.4th 302, 306 [such evidence is presumed to be admissible to assist the trier of fact in evaluating the credibility of the victim and the defendant].)

By its terms, section 1108 requires a trial court to engage in a section 352 analysis before admitting evidence of prior sex offenses. Under section 352, a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) The following factors are particularly significant in a section 1108 case: "(1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.) "A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*Ibid.*, citing *People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

We review a trial court's decision to admit or exclude evidence under section 352 for abuse of discretion. (*People v. Leon, supra*, 61 Cal.4th at p. 597; *People v. Ochoa* (2001) 26 Cal.4th 398, 437, disapproved on other grounds in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.) Reversal is warranted only when " ' "the court exercised its

discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*Ochoa*, at pp. 437-438.)

B.      *Due Process Challenge*

We first consider defendant's due process challenge to section 1108. Although he acknowledges that established law is to the contrary, to preserve the issue for future potential postconviction review, defendant argues that section 1108, both facially and as applied, violates his constitutional right to due process and a fair trial, and impermissibly reduced the People's burden of proof.[5]

Our California Supreme Court has repeatedly rejected the argument that admitting prior crimes evidence under section 1108 violates the constitutional right to due process and a fair trial. (See, e.g., *People v. Dworak* (2021) 11 Cal.5th 881, 900; *People v. Rhoades* (2019) 8 Cal.5th 393, 415; *Falsetta, supra*, 21 Cal.4th at p. 917 [recognizing that the trial court's discretion to exclude propensity evidence under § 352 "saves section 1108 from defendant's due process challenge"].) And it has also found that section 1108 does not improperly alter or reduce the prosecutor's burden of proof. (*Falsetta*, at p. 920.)

We must follow this binding authority. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 ["Under the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].) As *Auto Equity Sales* explains, it is not our function, as a court exercising inferior jurisdiction, to attempt to overrule decisions of a higher court, and we decline defendant's invitation to do so here. (*Ibid.*)

---

[5] The trial court granted defendant's motion in limine to federalize defendant's objections to include a due process objection.

*C.    Admission of Section 1108 Evidence*

Defendant maintains the trial court should have excluded the prior uncharged sexual offense evidence involving Briana, Melissa, and Paige because it was too remote in time, too dissimilar to the current charged offenses, highly inflammatory, and, because he had never been punished for those crimes, there was a danger the jury would use the present case as a means of punishing his prior sexual misconduct with those girls. We disagree.

The record shows the trial court properly weighed the relevant factors under section 352 at a pretrial hearing before admitting the challenged evidence. These factors, as the court explained, included: the evidence's "nature, relevance, possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses or excluding irrelevant, though inflammatory, details surrounding the offense."

In conducting its section 352 analysis, the court found that defendant's prior sexual misconduct with Briana, Melissa, and Paige all involved similarly aged victims and the same general type of conduct as charged. Defendant, however, argues that the prior conduct with Briana and Melissa--masturbating in front of them at the apartment complex while trying to coax them into showing him their vaginas or for Melissa to have sex with him--was "highly dissimilar" to the charged conduct.

We conclude there was no abuse of discretion in the trial court's similarity assessment as the charged and uncharged offenses bear significant similarities. Both involved defendant making unsolicited sexual advances to young girls that he knew when an opportunity arose to be alone with the victims. He would get irritated when they did not acquiesce to his sexual advances as when defendant got mad when Melissa refused to

14

follow him upstairs or when he told K.D. to stop kicking when she fought back as he pulled her pants down.

While it is true that the prior conduct was not identical to the charged conduct, "there is no requirement that the charged and uncharged offenses be so similar that evidence of the prior acts would be admissible under section 1101." (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 966.) Indeed, "[i]f such strict similarities were required, 'section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' " (*Ibid.*) Any dissimilarities in the alleged incidents related only to the weight of the evidence, not its admissibility under section 1108. (*Hernandez,* at p. 967.)

Defendant also asserts that the prior uncharged conduct involving Melissa and Briana was too remote to be admissible because there was a 20-year gap between those 1995 uncharged offenses and the charged offenses against K.D., which occurred sometime between 2012 and 2015. Not so.

Other courts have found that gaps of between 20 to 40 years were not too remote, especially if the uncharged and charged conduct was similar like it was here. (See e.g., *People v. Hernandez, supra*, 200 Cal.App.4th at pp. 967-968 [40-year gap not too remote where evidence demonstrated the defendant's propensity to make unwarranted sexual advances against young female children with whom he had a close familial connection while they were entrusted in his care]; *People v. Branch, supra*, 91 Cal.App.4th at pp. 284-285 [30-year gap between offenses not too remote where prior and current offenses were "remarkably similar"]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [gap of up to 20 years not too remote given similarity of prior and current acts]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977-978, 991-992 [passage of 20 to 30 years does not automatically render prior incidents prejudicial when uncharged and charged sexual offenses are similar].) Given the similarities of his targeted victims (minor females between the ages of 10 and 12 years old who lived near or with him) and the

circumstances under which he accosted them (usually when they were isolated and alone, rubbing their upper thighs, getting irritated when they failed to submit to his sexual advances), the trial court appropriately concluded that the incidents with Melissa and Briana were not too remote to be admissible.

Nor do we agree that the 1995 incidents were impossible or problematic to defend as defendant claims. Both Melissa and Briana testified and were subject to cross-examination by defense counsel. Defendant thus had the opportunity to challenge their testimony and defend against the uncharged conduct. Defendant, moreover, does not identify any witness who was not available to testify on his behalf. As in most sex offense cases, the number of witnesses potentially available to aid the defense was limited as the prior sexual misconduct mostly occurred when Melissa and Briana were each alone with defendant. (*Falsetta, supra*, 21 Cal.4th at p. 918 [§ 1108 enacted in recognition of the serious and secretive nature of sex crimes].)

We likewise reject defendant's claims that the evidence regarding Melissa and Briana was unduly inflammatory and would likely tempt the jury to punish defendant for the uncharged conduct. Attempting to engage young girls who lived nearby, or his niece who lived in the same house, in unwanted sexual activity were similar and none more inflammatory than the other. The court excluded the most inflammatory prior conduct-- defendant's conviction for raping and sodomizing his former girlfriend's mother and his acquittal for trying to force an eight-year-old girl to orally copulate him.

Nor is there any indication in the record that the jury punished defendant for the uncharged prior offenses. Testimony elicited at trial showed that defendant's prior conduct with Briana and Melissa was reported to police, and, at least as to Melissa, that she went to court regarding the incident. From such testimony, the jury rationally could have concluded that defendant's prior conduct had already been reported to law enforcement making it much less likely the jury punished defendant for the prior uncharged conduct.

16

Furthermore, in accordance with CALCRIM No. 1191A, the trial court properly instructed the jury that it could, but was not required to, consider the evidence of the uncharged crimes to conclude that defendant was disposed or inclined to commit sexual offenses. But if the People failed to prove the prior crimes evidence by a preponderance of the evidence, the jury was instructed to disregard the evidence entirely. The court also instructed the jury that even if it concluded defendant committed the prior uncharged offenses, that that conclusion was only one factor to consider along with all the other evidence and was not sufficient by itself to prove that defendant was guilty of committing the charged lewd and lascivious acts against K.D.; the People still had to prove each charge beyond a reasonable doubt.

Given Elizabeth's character testimony that defendant was not a person given to lewd conduct with children, the court further instructed the jury with CALCRIM No. 350 that such evidence could, by itself, "create a reasonable doubt whether the [d]efendant committed the offenses charged in this case."

We presume jurors understand and follow instructions. (*People v. Morales* (2001) 25 Cal.4th 34, 47.) Contrary to defendant's arguments, these instructions did not lower the prosecution's burden of proof. Instead, the instructions informed the jury of the permissible ways in which it could use the limited purpose section 1108 evidence.

We conclude the trial court properly discharged its duty to conduct a careful analysis of the five prior sexual offenses the prosecution sought to admit, and appropriately found that evidence of the three uncharged sex crimes involving Melissa, Briana, and Paige was more probative than prejudicial. While such prior acts evidence tended to demonstrate a propensity to commit the charged offenses, and, hence, were damaging to defendant, they were not *prejudicial* in the sense required under section 352. (*People v. Karis* (1988) 46 Cal.3d 612, 638 [in applying § 352, "prejudicial" is not

17

synonymous with "damaging"].) Defendant, therefore, has failed to demonstrate that the court abused its discretion by admitting the evidence.**6**

## II

### *Exclusion of Defense Evidence*

Defendant contends the trial court abused its discretion under section 352 by excluding his proffered evidence that K.D. had accused her cousin of sexual misconduct around the same time period, and that inconsistencies in K.D.'s version of events coupled with the cousin's denial of misconduct showed that K.D.'s allegations were false, which would undermine her credibility at trial. In a related argument, defendant contends the court should have permitted him to question Detective Mercadal about his investigation of the cousin, which defendant characterizes as inadequate since the detective had trouble locating the cousin even though the defense easily found him before trial. The exclusion of both lines of evidence, he contends, violated his federal constitutional rights to due process, a fair trial, the right to confront witnesses, and the right to present a complete defense. The trial court did not abuse its discretion by excluding defendant's proffered false allegation and inadequate investigation evidence.

It is true that a complaining witness's prior false allegation of sexual molestation is relevant and admissible under section 1103 as a specific instance of nonsexual conduct tending to disprove the truthfulness of the complaining witness's testimony in a present trial for sexual offenses. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456.) But prior molestation complaints would have no bearing on the complaining witness's

---

**6** Given our conclusion that the court did not err in admitting the evidence of prior uncharged sexual offenses against Melissa, Brianna, and Paige under section 1108, we need not address defendant's argument that the federal harmless error test in *Chapman v. California* (1967) 386 U.S. 18 applies.

credibility unless it also was established that those prior complaints were false. (*Id.* at p. 1457; see also *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 598-600.)

Here, with regard to the evidence concerning K.D.'s allegations of sexual misconduct against her cousin, it is not readily apparent that those prior allegations were false. The fact that K.D.'s cousin denied forcing her to orally copulate him when he was a teenager does not conclusively establish that K.D.'s allegations were false, especially since she maintained that they were true. Nor does the fact that K.D. delayed reporting the incident with her cousin until she reported defendant's misconduct or that she was unsure of whether the misconduct with her cousin occurred before or after the misconduct with defendant mean that her allegations involving her cousin were false. (See, e.g., *People v. Gray* (1986) 187 Cal.App.3d 213, 218) [recognizing that "[d]elayed reporting and inconsistency is not unusual with victims of child molest"].)

In *People v. Bittaker* (1989) 48 Cal.3d 1046, our Supreme Court upheld a trial court's exercise of discretion to exclude evidence pursuant to section 352 that the complaining witness had made false charges of sexual molestation against two other men after she testified that when she rejected the defendant's advances, he pulled a gun and said she " 'wouldn't argue if [he] pulled the trigger.' " (*Bittaker*, at p. 1097, rejected on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919.) In so ruling, our Supreme Court reasoned that "[t]he value of the evidence as impeachment depends upon proof that the prior charges were false. This would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges. Such a proceeding would consume considerable time, and divert the attention of the jury from the case at hand." (*Bittaker*, at p. 1097.)

The same is true here. Although there may have been some evidence that K.D. made inconsistent statements about whether the sexual misconduct with her cousin or with defendant occurred first, there was no conclusive evidence that her prior complaints against her cousin were false. As the trial court recognized, the fact that her cousin

19

denied the allegations while she maintained that they were true amounted to a he-said she-said on uncharged conduct, which had significant potential to confuse the jury and lead to an undue consumption of time to embark on the task of litigating the truthfulness of K.D.'s complaint against her cousin.

For similar reasons, we conclude the trial court properly exercised its discretion to exclude evidence regarding Detective Mercadal's alleged insufficient investigation of K.D.'s cousin on sexual misconduct allegations that occurred separate and apart from any allegations involving defendant. The adequacy of law enforcement's investigation of K.D.'s cousin has little, if any, tendency to prove or disprove whether defendant licked K.D.'s ear or rubbed her thigh toward her vagina while he tried to pull down her pants when she was between 8 and 10 years old. (§ 210 [defining relevant evidence as having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action, including the credibility of a witness or hearsay declarant].)

## III

### *Cumulative Error*

Defendant contends that cumulative prejudice from the alleged errors require reversal even if any individual error fails to mandate reversal on its own. However, because we have not found any prejudicial errors, there is no prejudice to accumulate. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 618.)

## DISPOSITION

The judgment is affirmed.

                        /s/
                        HOCH, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
EARL, J.